Sassoon Sales, Esq. SBN 59958
Law Offices of Sassoon Sales
16060 Ventura Blvd., Suite 110
Encino, CA 91436
Telephone: (818) 728-6658
Facsimile: (818) 817-7617
s@sassoonlaw.com

Steven A. Morris, Esq. SBN 126193
Jonathan M. Deer, Esq., SBN 164837
TURNER, AUBERT & FRIEDMAN, LLP
8383 Wilshire Blvd, Ste 510
Beverly Hills CA 90211
Telephone: (323) 653-3900
Facsimile: (323) 653-3021
jdeer@taflaw.net
smorris@taflaw.net

Attorneys for Plaintiffs,
CGL, INC., CHARLES GARAVITT and
DANA GARAVITT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| CGL, INC., a California corporation, CHARLES GARAVITT, an individual, and DANA GARAVITT, an individual, <br><br> Plaintiffs <br><br> vs. <br><br> ONEBEACON AMERICA INSURANCE COMPANY, and DOES 1 through 50, inclusive, <br><br> Defendants. | CASE NO. SACV 14-00927 JLS (DFMx) <br><br> PLAINTIFF CGL, INC.'S STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT <br><br> Judge:  Hon. Josephine L. Staton <br> Date:  September 11, 2015 <br> Time:  2:30 p.m. <br> Ctrm:  10A |

1

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| **II.    BACKGROUND FACTS** | |
| **A.    The Parties, Key Players, and Warehouse Locations** | |
| 1.    CGL, Inc. was incorporated on May 24, 2010, and was in the business of acquiring and reselling surplus wholesale merchandise.  Charles Garavitt was CGL's sole shareholder, director, and officer.<br><br>        [Charles Garavitt 3/11/14 Examination Under Oath, Ex. 306 at 10:6-13 and 30:18-33:13; Decl. of Robert Krier, ¶ 7.] | Undisputed. |
| 2.    Charley's Wholesale LLC was incorporated by Mr. Garavitt in 2009 in Missouri.  Charley's Wholesale, Inc. was incorporated in California on March 6, 2012.<br><br>        [Charles Garavitt 3/19/14 Examination Under Oath, Ex. 308 at 499:7-500:1 and Exs. 67 and 68 attached thereto.] | Undisputed, with the correction that Charley's Wholesale was not "incorporated" because it is a limited liability company, not a corporation.  Rather, it was formed.<br><br>        [Charles Garavitt 3/19/14 Examination Under Oath, Ex. 308 at 499:7-500:1 and Exs. 67] |

## Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations

| Uncontroverted Fact | Opposition |
|---|---|
| 3.     Charley's Wholesale LLC or Charley's Wholesale, Inc. purchased much of the merchandise allegedly lost in the fire and, according to Mr. Garavitt, transferred title to the merchandise to CGL pursuant to documents called Certificates of Transfer of Title.<br><br>          [Charles Garavitt 3/11/14 Examination Under Oath, Ex. 306 at 30:18-33:13; Decl. of Robert Krier, ¶ 7] | Disputed. The cited evidence does not support the asserted fact.  The cited evidence refers only to "Charley's Wholesale" and does not indicate which entity is referred to.  Charley's Wholesale, Inc., never purchased any goods or did any business.  It is not an active corporation.<br><br>          [Charles Garavitt Declaration ¶¶ 12, 18.] |
| 4.     Through most of 2011, CGL operated from a warehouse in Vernon. Beginning in late 2011, CGL moved all its inventory out of the Vernon warehouse to warehouses in Palmdale and Cerritos.  As of May 15, 2012, CGL's inventory was divided between the Palmdale and Cerritos warehouses.<br><br>          [Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 89:15-90:4 (discussing moving | Disputed. The cited evidence explicitly states that all of the inventory was moved from Alcoa (what defendant apparently refers to as "Vernon") to Cerritos. The cited evidence contains no testimony whatsoever about dividing inventory from Alcoa/Vernon between the Cerritos and Palmdale warehouses. All it says is that "some of the property" from Alcoa eventually made its way to the Palmdale warehouse. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| into Cerritos) and 115:11-23 (discussing Vernon inventory moving to Cerritos and Palmdale); Charles Garavitt 3/11/2014 Examination Under Oath, Ex. 306 at 41:25-43:4 (acknowledging being out of Vernon by January 2012); and Charles Garavitt Depo., Ex. 311 at 34:11-23 (testifying re: moving into Palmdale starting in December 2011).] | [Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 89:15-90:4 (inventory from Alcoa was transferred to Cerritos); Charles Garavitt Depo., Ex. 311 at 34:11-23 (some of the inventory eventually made its way to Palmdale).] |
| 5.      In November 2011, CGL obtained a property insurance policy from OneBeacon covering its Palmdale and Cerritos warehouse locations with policy limits of $60 million, and the policy remained in effect on May 15, 2012.  The policy did not provide coverage for (i) losses caused by intentional acts of the insured, such as arson, or (ii) any claim as to which the insured intentionally misrepresented or concealed a material fact concerning the claim. | Undisputed. |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| [Policy Excerpts, Ex. 255 at p. P 000001 (declarations page), P 000006 (schedule of locations), P 000011 (level of limits), P 000033 (general misrepresentation and concealment provision), P 000068 & P 000072 (dishonest and criminal acts exclusion), P 000068 & P 000074 (willful acts exclusion), P 000108 (commercial property misrepresentation and concealment provision), and P 000120 (California misrepresentation and concealment endorsement).] | |
| 6.     The policy limits on CGL's property insurance policy prior to the OneBeacon policy were only $1 million.          [Ex. 315 [excerpts of Western Heritage Insurance Company policy] (see page marked GORST-0092).] | Disputed.  The prior policy was not a replacement cost policy, as was the OneBeacon policy.  OneBeacon had different underwriting requirements and minimum insurance limits it would sell CGL.  In addition, CGL also took possession of inventory with a value far exceeding one million dollars.  A one million dollar policy no longer met its |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| | needs. [Charles Garavitt Declaration ¶¶ 41, 42.] |
| 7.  Ron Van Heel was responsible for CGL's inventories and inventory records and for shipping merchandise to CGL's Palmdale warehouse.  He worked in CGL's Vernon and Cerritos warehouses but never in the Palmdale warehouse. [Van Heel Depo., Ex. 312 at 11:18-21, 13:14-17, 20:7-25, 94:6-8.] | Undisputed that Mr. Van Heel was responsible for CGL's warehouse related activities. Disputed that Mr. Van Heel was never at the Palmdale warehouse.  The cited evidence does not support the stated fact and makes no reference to it. |
| 8.  Cesar Sosa worked in CGL's Palmdale facility and was in charge of receiving any shipments that came into the Palmdale warehouse prior to the fire. [Van Heel Depo., Ex. 312 at 53:5-11; Cesar Sosa Depo., Ex. 309 at 29:17-30:24.] | Disputed to the degree it implies Cesar Sosa was ever an employee of CGL, Inc. He was hired by the warehouse owner and never worked as an employee of CGL, Inc. [Charles Garavitt Declaration ¶ 27.] |
| 9.  The Greenspan Company, Inc. is | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| a public adjusting firm that CGL hired within a week of the fire and was, by CGL's admission, its agent for purposes of presenting the claim. [Charles Garavitt 3/11/2014 Examination Under Oath, Ex. 306 at 60:10-62:18; Requests for Admission and CGL's responses thereto, Exs. 313 and 314, at RFA No. 71 (admitting agency).] | |
| 10.    Thomas Rowley is an attorney and was, by CGL's admission, its agent for purposes of presenting the claim. [Decl. of Robert Krier, ¶ 7; Requests for Admission and CGL's responses thereto, Exs. 313 and 314, at RFA No. 70 (admitting agency).] | Undisputed. |

**B.    <u>CGL's Precarious Financial Condition</u>**

| | |
|---|---|
| 11.    In January 2012, a $99,105.51 judgment was entered against Mr. Garavitt and CGL in an unlawful | Undisputed. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| detainer action filed by the landlord of the Vernon warehouse in August 2011.<br><br>[Ex. 295 (unlawful detainer judgment).] | |
| 12.   CGL's tax returns and financial records valued its total inventory as of December 31, 2012 – five and a half months before the fire – at $250,000.<br><br>[Ex. 126 (excerpts of 2011 tax return); Ex. 296 (income statement).] | Disputed.  The tax return for CGL, Inc., is currently being amended and consolidated with various entities operated by Mr. Garavitt to provide, among other things, a more accurate total of inventory and will show a higher inventory amount when completed for that tax year.<br><br>[Charles Garavitt Declaration ¶ 62.] |
| 13.   In the two months prior to the fire, CGL's bank account balance was as low as $46.81 and never more than $3,973.80.<br><br>[Ex. 118 (excerpts of bank statements).] | Disputed to the extent that it implies CGL and the Garavitts were without resources.  At that time, the companies were still primarily using the Charley's Wholesale bank account, which had a balance of $146,180.74 in March 2012, $103,369.00 in April, and $100,698.52 |

**8**

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| | in May.  In 2012, CGL and its related entities (all of which are filing consolidated tax returns) deposited over $1.67 million into various U.S. bank accounts. All of this information was provided to OneBeacon and is known to it.<br><br>[Charles Garavitt Declaration ¶¶ 43, 44.] |
| 14.    As of May 15, 2012, Charles Garavitt was the personal guarantor for over $9 million in debt owed in connection with the purchase of millions of yards of fabric from a company called Tower Bridge Trading.  The guaranty was secured by the Garavitts' real property.<br><br>        [Ex. 136G, pp. 80-88 [signed purchase and sale agreement]; Charles Garavitt 3/11/2014 Examination Under Oath, Ex. 306 at 171:24-172:14; Charles Garavitt Depo., Ex. 311 at | Undisputed. |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
| --- | --- |
| 53:12-54:6.] | |
| 15.     Garavitt and CGL planned to pay off the $9-plus million in debt to Tower Bridge Trading by selling the fabric at a profit.<br><br>          [Charles Garavitt 3/11/2014 Examination Under Oath, Ex. 306 at 168:24-169:4; Charles Garavitt Depo., Ex. 311 at 55:22-56:16.] | Undisputed. |
| 16.     In April 2012, just a month before the fire, the buyer to whom CGL had sold over a million yards of the Tower Bridge Trading fabric sent CGL a letter saying that the fabric was defective, refusing to pay, and seeking damages. On March 12, 2012, a different customer also sent a letter complaining that the fabric was defective.<br><br>          [Exs. 122 and 121; Charles Garavitt Depo., Ex. 311 at 126:20-127:14 and 128:1-129:11 (authenticating | Disputed.  The letter of April 12, 2012 indicates that the fabric needs an unexpected process, sanforizing.  CGL agreed to adjust the price to satisfy the customer. Even with that adjustment, the sale provided sufficient profit.  The letter of March 12, 2012 indicates that the buyer knows Mr. Garavitt to be "an honest businessman" and indicates the buyer will call to work something out.  Neither letter refuses to pay.  Prior to the fire, Mr. Garavitt had no reason to |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| the letters and admitting the facts).] | believe either (a) that he would not be able to make a sufficient profit on the sale of the denim or (b) that he would have any trouble adjusting his $9 million of debt which was a purchase money debt held by the vendor who sold CGL's affiliated company the fabric.<br><br>[Charles Garavitt Declaration ¶¶ 47, 48.] |
| 17. Mr. Garavitt was insolvent and did not have the cash or income necessary to pay the many debt obligations he had at the time of the fire, and had filed at least two bankruptcies to avoid creditors.<br><br>[Decl. of Karl Ehlert and Ex. 1 thereto at p. 3, ¶¶ 8-10.] | Disputed. Karl Ehlert's report admits that, excluding the Tower Bridge obligation, which was disputed and in litigation (and still is today), the Garavitt's debt to equity ratio was 1, which is not insolvent. Karl Elhert's report is also based upon the after-acquired knowledge that the denim was seriously defective and therefore worth far less than the debt on it. At the time of the fire, neither Mr. Garavitt nor his buyer was aware of those more serious |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| | defects.  Mr. Garavitt had no reason to believe he would not sell the denim at a substantial profit and pay Tower Bridge. [Charles Garavitt Declaration ¶¶ 48, 50.] |

**C.     The Fire and CGL's Claim**

| | |
|---|---|
| 18.     Around 4:30 p.m. on May 14, 2012, CGL employee Soci Mayor spoke with CGL's Palmdale alarm vendor, Mel Wolfe of Hi Desert Alarm.  The conversation included the following questions and answers:<br><br>        Soci: "I just, we'd like to understand, that you said that, if the water's shut off, then you are unable to recognize due to the [P-I-C] problem, correct?"<br><br>        Mel: "Correct.  That is correct."<br><br>        Soci: "Okay.  Alright.  But other than that, if there's a fire, then you would be able . . ."<br><br>        Mel: "If, if water, if water moves | Undisputed that the excerpt of the conversation exists, but it is taken out of context and does not mean what it implies without the context.  Disputed to the extent it implies Soci Mayor was attempting to learn how to disable the fire alarm.  In context of the broader conversation, the alarm company had not completed work on the alarm and refused to do so until a check was provided, which would not come until Thursday.  Soci Mayor was responding to what she had been told by the alarm company, concerned it would not work, and confirming that even without the additional work being completed, the |

12

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It
Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| through the fire sprinkler system, and it trips that fire sprinkler flow valve that's on the riser back there in the back, then we would get signals off of that and be able to call the fire department to respond.  Again, assuming that there's no power problems, assuming that there's no phone problems, or any other problems going on at the time."<br>Soci: "Okay."<br>Mel: "Okay?"<br>Soci: "Alright.  Understood."<br>      [Ex. 293 at 14:12-15:6<br>[transcript of phone call].] | fire alarm would in fact work.  Even the investigating police officer interpreted the call this way.  Soci Mayor was not involved in any arson on the property.<br>      [Ex. 293 in its entirety [transcript of phone call]; Exhibit 291, pg. 785 (Det. Acevedo's report showing his interpretation of the recorded telephone conversation that the call was to confirm that the alarm would work); Mayor Depo., Exhibit 383; 78:9-79:9, 80:4-11 and 81:17-83:7] |
| 19.    In the early morning hours of May 15, 2012, a fire destroyed the Palmdale warehouse.  The investigating authorities (i) found the sprinkler water supply valve in the "off" position, and (ii) concluded that the fire was probably | Disputed.  The formal conclusion of the Sheriff's arson investigation report is that, although they suspected arson, they could not determine a cause of origin for the fire and the case was closed.<br>      [Acevedo Dec. pg. numbered |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| arson. | 783; Ex. 382 (Plaintiff's unredacted |
|     [Decl. of Sergeant Joseph Acevedo, ¶ 3; Acevedo Report, Ex. 291 at pp. 2 & 5; Robert Jones Report, Ex. 292 at pp. 8-12.] | version, pg. 5, last two paragraphs; C. Garavitt Dec. ¶66.] |
| 20.    CGL reported the fire to OneBeacon the day it occurred.  On June 13, 2012, CGL's attorney Thomas Rowley told OneBeacon that the loss would likely approach or exceed $100 million, and that the cost to replace the destroyed medical supplies alone would exceed $34 million.<br>    [Charles Garavitt 12/7/12 Examination Under Oath, Ex. 302 at 20:17-19; Charles Garavitt 3/11/2014 Examination Under Oath, Ex. 306 at 7:23-8:3; Ex. 154 (Rowley 6/13/2012 letter).] | Disputed as to the date of report of the fire, inasmuch as the sited evidence does not support the contention.  Undisputed that Attorney Rowley sent the June 13, 2012 letter. |
| 21.    CGL ultimately (on November 29, 2013) signed a sworn statement in | Undisputed. |

**14**

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| proof of loss valuing the loss at more than the $60 million policy limits.<br><br>    [Ex. 288.] | |
| 22.    By letter dated May 8, 2014, OneBeacon denied CGL's claim.<br><br>    [Ex. 252.] | Undisputed. |

### III.    CGL MADE MASSIVE MISREPRESENTATIONS IN ITS CLAIM

### A.    The Items CGL Claimed Could Not Have Fit in the Warehouse

| | |
|---|---|
| 23.    The photographs in Ex. 7 were taken 3-4 weeks before the fire and, with 99% accuracy (subject to a few items being shifted from the warehouse to the retail portion of the store after the photos were taken), reflect the contents and location of contents of the Palmdale building as of the time of the May 15, 2012 fire.<br><br>    [Ex. 7; Cesar Sosa Depo., Ex. 309 at 122:4-16 (authentication of the photos taken between April 17 and April 26 2012), 173:25-175:12 and | Disputed that the photos reflect to condition of the warehouse at the time of the fire with 99% accuracy.  The warehouse was much more filled than reflected in the photographs. Multiple witnesses have described the warehouse as so full, you could not walk through it. At the time of the fire, the warehouse no longer had broad aisles and was filled to more than ten feet high and even more than fifteen feet high in some areas. Further disputed that statements of Mr. Sosa are admissions.  On the contrary, |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 176:16-1773 (admissions that the warehouse and retail portions of the building remained "99 percent the same at the time of the fire" as compared to the April 2012 photos).] | Mr. Sosa is an adverse witness.  He was not an employee of CGL and his statements are not admissions.  He demanded money from CGL just before his testimony, which CGL refused, and he has made multiple legal claims against CGL subsequently for purported labor and wage violations.  Mr. Sosa was and extremely biased witness during his deposition.<br><br>[Rojas Depo Exhibit 375. 109:20-110:14.  Charles Garavitt Declaration ¶¶ 34-38.] |
| 24.     Ex. 9 is a warehouse map drawn by Palmdale warehouse manager Cesar Sosa a month or two after the fire showing the layout of the retail and warehouse portions of CGL's Palmdale building, to the best of Mr. Sosa's recollection at the time.<br><br>[Ex. 9; Cesar Sosa Depo., Ex. 309 at 123:1-23, 151:2-21, 187:7- | Disputed both that the map is accurate and that it was drawn to the best of Mr. Sosa's recollection.<br><br>The warehouse was much more filled than reflected in the map. The warehouse as so full, you could not walk through it.  At the time of the fire, the warehouse no longer had broad |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| 10] | aisles and was filled to more than ten feet high and up to fifteen feet or more in some areas. |
| | Mr. Sosa demanded money from CGL just before his testimony, which CGL refused, and he has made multiple legal claims against CGL subsequently for purported labor and wage violations and workers compensation.  Mr. Sosa was a biased witness during his deposition. |
| | [Rojas Depo Exhibit 375. 109:20-110:14; Charles Garavitt Declaration ¶¶ 34-40.] |
| 25.    Fewer than 400 pallets of palletized merchandise were in the Palmdale warehouse at the time of the fire.<br><br>[Ex. 7 (pre-fire photos); Ex. 9 (warehouse map); Decl. of Ronald Yaros (warehousing expert) at ¶ 5 and Ex. 1 thereto at pp. 17-18 (estimating number of pallets in warehouse to be | Disputed, both as to the number of pallets and as to any implication that there was not a substantial amount of unpalletized merchandise in the warehouse.  OneBeacon's expert, Robert Yaro, incorrectly estimates the number of pallets based upon them being "single-stacked".  Pallets were often stacked two and three high, goods |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| approximately 369).] | were stacked up to close to the 18 foot ceiling.  Items were unpalletized, taken out of their packing, condensed, and re-palletized together with other goods to take up far less space than how they were shipped. |
| | Yaro incorrectly assumes that the pallets were placed to allow for walkways and loading areas.  By the time of the fire, the warehouse was so full, you could not even walk through it.  Empty pallets were stacked up behind the warehouse after the inventory had been condensed and stored in either of the ways mentioned above (repalletized in much smaller space or stored without pallets). |
| | [Van Heel Dec. ¶14-22; Rojas Depo. Exh. 375, 109:20-110:14.] |
| 26.    The *maximum* capacity of the warehouse portion of the Palmdale building for pallets of merchandise, after | Disputed, both as to the number of pallets and as to any implication that there was not a substantial amount of |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| allowing for the space taken up by the unpalletized fabric and by empty walkways and loading areas, was less than 500 pallets, single-stacked.<br><br>      [Decl. of Ronald Yaros, ¶ 5 and Ex. A thereto at pp. 16-17 (estimating pallet capacity of approximately 435 pallets, after allowing for space taken by fabric).] | unpalletized merchandise in the warehouse.  OneBeacon's expert, Robert Yaro, incorrectly estimates the number of pallets based upon them being "single-stacked".  Pallets were often stacked two and three high, goods were stacked up to close to the 18 foot ceiling.  Items were unpalletized, taken out of their packing, condensed, and re-palletized together with other goods to take up far less space than how they were shipped.<br>Yaro incorrectly assumes that the pallets were placed to allow for walkways and loading areas.  By the time of the fire, the warehouse was so full, you could not even walk through it.  Empty pallets were stacked up behind the warehouse after the inventory had been condensed and stored in either of the ways mentioned above (repalletized in much smaller space or stored without pallets).<br>     [Van Heel Dec. ¶14-22; Rojas |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| | Depo. Exh. 375, 109:20-110:14.] |
| 27.    CGL's claim included: | Undisputed as to (a), (b), (c), (d), (f), and (h). |
| | Undisputed as to size and quantity and amount of claim on (e), disputed as to description which is not supported by the cited evidence. |
| | Disputed as to (g) inasmuch as Greenspan submitted an amended claim when it discovered it had misidentified the goods. |
| | Disputed as to (j) with respect to the term "hair products". The evidence cited by OneBeacon refers to human and synthetic hair, not hair products. |
| (a) over $16 million for the alleged loss of 2 million sheets of 4-ply, conservation grade **mat board** with inside dimensions of 23.5" x 31.5" (fits 24" x 32" artwork). | [William Rake Declaration ¶ 11.] |
| [(a) Ex. 136A, p. 2; and Ex. 136J, p. 2.] | |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It**

**Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|

(b) over $4.5 million for the alleged loss of 1,173,975 24" x 36" **posters**.

[(b) Ex. 136A, p. 2; and Ex. 136J, p. 2.]

(c) over $10,000,000 for the alleged loss of 100,000 24" x 36" **picture frames manufactured by CGL** out of Ramin wood.

[(c) Ex. 136L, p. 3; and Ex. 136M, p. 9.]

(d) over $950,000 for the alleged loss of 70,000 **pre-fabricated picture frames** of various sizes.

[(d) Ex. 136L, p. 3.]

(e) over $1.6 million for the alleged loss of 1 million sheets of 22" x 28" **poster board** (aka "tag board") – which is lightweight colored cardboard or heavy paper stock – and 1 million sheets of **art paper** (consisting of 200,000 sheets of 14.4" x 20.5" construction paper and 800,000 sheets

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
| --- | --- |

of 24" by 36" rice paper).

[(e) Ex. 136A, p. 2; and Ex. 136C, pp. 2-3.]

(f) over $10 million for the alleged loss of more than 300,000 articles of **clothing**.

[(f) Ex. 136A, p. 2; and Ex. 136I, pp. 2-7.]

(g) over $1.7 million for the alleged loss of over 299,000 **cell phone accessories**.

[(g) Ex. 136A, p. 2; and Ex. 136H, pp. 2-3.]

(h) over $1.9 million for over 99,000 units of **medical supplies**.

[(h) Ex. 136A, p. 2; and Ex. 136B, pp. 2-3.]

(i) over $7.4 million for hair extensions and similar **hair products**.

[(i) Ex. 136A, p. 2; and Ex. 136C, pp. 2-3.]

28.   **Mat Boards**:  It would have taken

Disputed.  It took a small fraction of

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| more than **1,340 pallets** to accommodate 2 million mat boards of the claimed size. | that estimate.  The material was moved in 10 truck loads, and filled 201 pallets. |
| [Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 27 (estimating 2,000 pallets, and that 2 million mat boards at 1/16 inch thick each could create a stack 10,417 feet tall – almost 2 miles high or the height of 7 Empire State Buildings). | [Van Heel Dec. ¶18; Vasquez Dec. ¶7, Exhibit "B", pgs. 20-25, 28-31.] |
| **Note:  For facts 28-36 (except fact 34), OneBeacon has used a figure for the estimated pallet count that is approximately 33% lower than the estimate of warehousing expert Ron Yaros.  This provides a large margin for error in Mr. Yaros' estimates.]** | OPPOSITION TO NOTE: The note is disputed inasmuch as it is not supported by evidence nor is there any evidence to discuss or support any characterization of the margin for error and whether 33% is large or small.  As set forth below, Plaintiff disputes each of the facts which purportedly have a small margin of error with evidence showing large errors in his calculations. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 29. **Posters:** It would have taken more than **80 pallets** to accommodate 1,173,975 posters.<br><br>    [Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 28 (estimating 125 pallets).] | Undisputed. |
| 30. **Frames Made by CGL:** It would have taken more than **295 pallets** to accommodate the claimed 100,000 picture frames of the size claimed by CGL.<br><br>    [Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 28 (estimating 446 pallets).] | Disputed.  Most of the frames were stored outside, cut but unassembled. There were only 4 or 5 pallets of assembled framed.<br>    [Charles Garavitt Declaration ¶ 38.] |
| 31. **Pre-Fabricated Frames:** It would have taken more than **8 pallets** to accommodate the claimed quantity and size of pre-fabricated picture frames.<br><br>    [Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 29 (estimating 13 pallets).] | Undisputed. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
| --- | --- |
| 32.    **Poster Board and Art Paper:** It would have taken more than **220 pallets** to accommodate the 1 million sheets of poster board/tag board and the 1 million sheets of art paper.<br><br>        [Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 22-24 (estimating 339 pallets).] | Disputed.  Yaros calculation method is incorrect.<br><br>        [Van Heel Dec. ¶14, 17-21.] |
| 33.    **Clothing**: It would have taken more than **145 pallets** to accommodate the claimed quantity and size of clothing supposedly stored in the warehouse portion of the Palmdale building, after deducting the estimated 20-25 pallets of clothing that had been unboxed and put on display in the retail part of the building.<br><br>        [Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 25-26 (estimating 248 pallets); Depo. of Cesar Sosa, Ex. 309 at 100:15-102:15 | Disputed. A majority of the clothing was unboxed and on the retail section.<br><br>        [Charles Garavitt Declaration ¶ 35.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| (estimating that only 20-25 pallets of clothing had been unboxed and put on display in the retail part of the store).] | |
| 34.   **Cell Phone Accessories:** According to CGL's own shipping records, the cell phone accessories required more than **150 pallets**. OneBeacon's expert estimates the required pallets to be approximately 139 pallets.<br><br>          [Ex. 136H, pp. 57-70 (assuming 22 pallets per truckload for those bills of lading that do not list a pallet count); Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 25 (estimating 139 pallets)] | Disputed.  The cited evidence does not support the fact.  The bills of lading do not reflect 150 pallets. |
| 35.   **Medical Supplies**:  According to CGL's own shipping records, the medical supplies took up 45 pallets.  In fact, it would have taken more than **85 pallets** to accommodate the claimed | Disputed that the medical supplies would have taken up more than 85 pallets.  The cited evidence does not support that fact; OneBeacon cites to CGL's bills of lading which refute that |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| quantity of medical supplies. | fact. |
| [Ex. 136B, pp. 21-24; Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-21 (estimating 134 pallets).] | Undisputed that the bills of lading reflect the medical supplies taking up 45 pallets. |
| 36.   **Hair Products**:  It would have more than **20 pallets** to accommodate the claimed quantity of hair products.<br>[Decl. of Ron Yaros, ¶ 7 and Ex. 1 thereto at pp. 18-19 & 25 (estimating 35 pallets).] | Undisputed. |

**B.**   <u>Any Mat Boards, Posters, Frames, and Poster Boards Amounted to Less than 20 Pallets</u>

| | |
|---|---|
| 37.   There were four areas of palletized material in the warehouse at the time of the fire with the pallet capacity indicated below:<br>  **Area 1**: A large area with a capacity of approximately **160 pallets** along the north wall, labelled in Ex. 9 as containing "wood cabinets," "acc. electronics," "wood coffee tables," | Disputed.  The warehouse did not have four separate areas.  These are areas created in the imagination of One Beacon's expert who has only vaguely described them.  He never saw the warehouse prior to the fire.  He has not even marked them on a floor plan of the warehouse. Instead, he relied upon an inaccurate map from a highly biased |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

## Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations

| Uncontroverted Fact | Opposition |
|---|---|
| "wood consoles," "acrylic, metal, cardboard display," and "arcades."<br><br>**Area 2**:  A large area directly above Area 1 on Ex. 9 with a capacity of approximately **125 pallets**, labelled in Ex. 9 as containing "Hospital Supply," "Seat Cover," "Pallets Clothes," "Clothes," and "Electronics."<br><br>**Area 3**: A strip of pallets several pallets deep along the eastern edge of the "Fabric Roll" area with a capacity of approximately **64 pallets**, labelled on Ex. 9 as containing "Seats," "Watches," "Wall," "Hair Acc.," "Bags/Purses," "Wigs," and "Electronics."<br><br>**Area 4**:  A strip of pallets that appears to be 2 pallets deep along the northern edge of the "Fabric Roll" area with a capacity of approximately **20** | witness, Mr. Sosa.  The goods were not arranged in the warehouse in the manner described by Mr. Sosa and relied upon by Mr. Yaro.  Photographs confirm that the goods were maintained in the warehouse in a very different manner that assumed by Mr. Yaros.<br><br>[Charles Garavitt Declaration ¶¶ 37-40.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| **pallets**, labelled on Ex. 9 as containing "Displays" and "Picture Freams [sic] Acc./Poster Board." | |
| [Ex. 9; Decl. of Ron Yaros, ¶ 6 and Ex. 1 thereto at pp. 16-18.] | |
| 38.   **Area 1** contained only the items listed on Ex. 9.  It did not contain mat boards, posters, poster board, art paper, or picture frames. | Disputed.  The warehouse did not have four separate areas.  These are areas created in the imagination of OneBeacon's expert who has only vaguely described them.  He never saw the warehouse prior to the fire.  He has not even marked them on a floor plan of the warehouse. Instead, he relied upon an inaccurate map from a highly biased witness, Mr. Sosa.  The goods were not arranged in the warehouse in the manner described by Mr. Sosa and relied upon by Mr. Yaro.  Photographs confirm that the goods were maintained in the warehouse in a very different manner that assumed by Mr. Yaros, much denser and not neatly organized.  Some |
| [Cesar Sosa Depo., Ex. 309 at 157:18-158:2 (both rows of pallets labelled "wood coffee tables" and "wood consoles" in Area 1 were in fact entirely composed of wood coffee tables and wood consoles). | |
| Cesar Sosa Depo., Ex. 309 at 158:3-11 (both rows of pallets labelled "Acc. Electronics" in Area 1 were in fact entirely composed of electronics accessories). | |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

## Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations

| Uncontroverted Fact | Opposition |
|---|---|
| Cesar Sosa Depo., Ex. 309 at 158:13-159:1 (the entire row of pallets labelled "Acrylic, Metal, Cardboard Display" in Area 1 was in fact entirely composed of display racks of some kind).] | photos of the warehouse shortly before the fire depict the items which OneBeacon contends were not in the warehouse, so they had to be somewhere. |
| | [Charles Garavitt Declaration ¶¶ 33-40.] |
| 39.   **Area 2** in fact was largely or completely composed of the items listed in Ex. 9.  It did not contain mat boards, posters, poster board, art paper, or picture frames. | Disputed.  The warehouse did not have four separate areas.  These are areas created in the imagination of OneBeacon's expert who has only vaguely described them.  He never saw the warehouse prior to the fire.  He has not even marked them on a floor plan of the warehouse. Instead, he relied upon an inaccurate map from a highly biased witness, Mr. Sosa.  The goods were not arranged in the warehouse in the manner described by Mr. Sosa and relied upon by Mr. Yaro.  Photographs confirm that the goods were maintained in the warehouse in a very different manner that assumed by Mr. Yaros, much |
| [Ex. 9; Ex. 7 at pp. 294, 295, 298, 299 (photographs of Area 2, annotated by Mr. Sosa as to contents); Cesar Sosa. Depo., Ex. 309 at 131:11-143:18 (Mr. Sosa's testimony discussing the photographs depicting Area 2).] | |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| | denser and not neatly organized.  Some photos of the warehouse shortly before the fire depict the items which OneBeacon contends were not in the warehouse, so they had to be somewhere. |
| | [Charles Garavitt Declaration ¶¶ 33-40.] |
| 40.    **Area 3** in fact was largely or completely composed of the items listed in Ex. 9.  It did not contain mat boards, posters, poster board, art paper, or picture frames. | Disputed.  The warehouse did not have four separate areas.  These are areas created in the imagination of OneBeacon's expert who has only vaguely described them.  He never saw the warehouse prior to the fire.  He has not even marked them on a floor plan of the warehouse. Instead, he relied upon an inaccurate map from a highly biased witness, Mr. Sosa.  The goods were not arranged in the warehouse in the manner described by Mr. Sosa and relied upon by Mr. Yaro.  Photographs confirm that the goods were maintained in the warehouse in a very different manner |
| [Ex. 9; Ex. 7 at pp. 303-305 (photographs of Area 3, annotated by Mr. Sosa as to contents); Cesar Sosa Depo., Ex. 309 at 145:13-156:21 (Mr. Sosa's testimony discussing the foregoing photographs).] | |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| | than assumed by Mr. Yaros, much denser and not neatly organized. Some photos of the warehouse shortly before the fire depict the items which OneBeacon contends were not in the warehouse. |
| | [Charles Garavitt Declaration ¶¶ 33-40.] |
| 41. **Area 4** – circled in blue ink by Mr. Sosa in Ex. 9 – is the only area in the warehouse portion of the building that did contain or might have contained mat boards, posters, poster board, art paper, or picture frames. | Disputed. The warehouse did not have four separate areas. These are areas created in the imagination of OneBeacon's expert Mr. Yaro who has only vaguely described them. He never saw the warehouse prior to the fire. He has not even marked them on a floor plan of the warehouse. Instead, he relied upon an inaccurate map from a highly biased witness, Mr. Sosa. The goods were not arranged in the warehouse in the manner described by Mr. Sosa and relied upon by Mr. Yaro. Photographs confirm that the goods were maintained |
| [Ex. 9 (Sosa's warehouse map, with blue circle); Ex. 7 at pp. 307-311 (photographs of Area 4, annotated by Mr. Sosa as to contents). | |
| Cesar Sosa Depo., Ex. 309 at 170:14-18 ("any posters" were in Area 4). | |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| Cesar Sosa Depo., Ex. 309 at 170:19-171:1 (admission that all picture frames, other than a small number on display in the retail part of the store, were in Area 4).] | in the warehouse in a very different manner that assumed by Mr. Yaros, much denser and not neatly organized. Photos of the warehouse from both shortly before and after the fire depict the items which OneBeacon contends were not in the warehouse, so they had to be somewhere. |
| | [Charles Garavitt Declaration ¶¶ 33-40.] |
| [Ex. 9 (Mr. Sosa's warehouse map drawn shortly after the fire); Ex. 7 at pp. 293-309 (April 2012 warehouse photographs with handwritten annotations by Mr. Sosa indicating the contents of certain pallets); Cesar Sosa Depo., Ex. 309 at 122:10-174:17 (detailed testimony by Mr. Sosa covering all the contents of the warehouse).] | |
| 42.    The vast majority of the space in the Palmdale warehouse at the time of | Disputed.  "Vast majority" is not a fact or a measurement.  It is an opinion |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It
Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| the fire was taken up by fabric, electronics, clothing, medical supplies, furniture, seat cushions, and merchandise display racks.  The quantity of mat boards, posters, poster board and art paper, and picture frames claimed by CGL could not possibly have fit in the limited remaining space in the warehouse. | which is intended to imply there was not enough room for the other items claimed.  In arriving at this opinion, OneBeacon's expert, Robert Yaro, incorrectly estimates the amount of space taken up by inventory based upon them being "single-stacked".  Pallets were often stacked two and three high, goods were stacked up to close to the 18 foot ceiling.  Items were unpalletized, taken out of their packing, condensed, and re-palletized together with other goods to take up far less space than how they were shipped. |
| [Ex. 9 (Mr. Sosa's warehouse map drawn shortly after the fire); Ex. 7 at pp. 293-309 (April 2012 warehouse photographs with handwritten annotations by Mr. Sosa indicating the contents of certain pallets); Cesar Sosa Depo., Ex. 309 at 122:10-174:17 (detailed testimony by Mr. Sosa covering all the contents of the warehouse).] | Yaro incorrectly assumes that the pallets were placed to allow for walkways and loading areas.  By the time of the fire, the warehouse was so full, you could not even walk through it.  Empty pallets were stacked up behind the warehouse after the inventory had been condensed and stored in either of the ways |

**34**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| | mentioned above (repalletized in much smaller space or stored without pallets).<br><br>Mr. Yaro relies upon an inaccurately drawn map of the warehouse drawn by a highly biased witness.  Contrary to the map, goods were not stored in an organized manner on shelves with wide aisles.  Photographs show a densely packed warehouse with items stacked very high.  Mr. Yaro also did not account for inventory stored stored in boxes which were used as a dividing wall between the retail and warehouse portions of the space.  There was sufficient room to also house the matt boards, posters, poster board and art paper, and those picture frames that were not stored outside.<br><br>[Charles Garavitt Declaration ¶¶ 33-40.] |

43.    The pallets of mat boards, posters,

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| poster board and art paper, and picture frames in CGL's possession could be visually distinguished from other types of items as follows: | |
| (a) **Posters**: The posters were distinctively packaged in one of two formats: | (a) Undisputed that *some* of the posters were hand stacked and stored in the manner described. Disputed that they were stacked only five feet high in the Palmdale warehouse. |
| (i) unboxed posters that had little stickies protruding every 100 or 200 sheets, totaling only about 3 ½ feet high on each pallet, or | [Charles Garavitt Dec. ¶35.] |
| (ii) boxed posters stacked approximately 5 feet high on pallets, in boxes only about 2-3 inches high, like those shown on pages 25, 28 and 30 of Ex. 238, many bearing the legend "Better Office Products" or "Innovative Art." | |
| [(a) Van Heel Depo., Ex. 312 at 123:17-124:21, 141:5-145:1, 147:4-148:5, 142:11-22 (custom sized pallets), 144:17-20 (same); 155:3-8 (5' height of the taller boxed, pallets), 191:4-192:2, | |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 193:12-194:9, 194:10-25 (Van Heel admission that boxed posters looked like page 30 of Ex. 238), 199:12-17 (Van Heel admission that there should be poster pallets in Palmdale looking like these); Ex. 238 [post-fire photo of posters in the Cerritos warehouse].] | |
| (b) **Frames Made By CGL**:  The frames allegedly constructed by the two Mexican laborers were wrapped in shrink wrap on pallets about 4 feet high. | (b) Disputed.  The vast majority of the frames cut by the Mexican laborers were stored outside the warehouse with the other wood, unassembled for easy shipping to South America. |
| [(b) Ron Van Heel 11/25/2013 Examination Under Oath, Ex. 305 at 534:4-7 and 535:8-14.] | [Charles Garavitt Declaration ¶¶ 60-61.] |
| (c) **Pre-Fabricated Frames**: The pre-fabricated picture frames were on standard sized pallets with printing on the outside showing that each box contained 72 frames of four different sizes, with each pallet being about 8 feet tall, like the pallet shown on page 2 of Exhibit 240. | (c) Disputed that this means they were visually distinctive. The cited evidence does not support that conclusion.  Van Heel's cited testimony refers to how they looked in a different warehouse, not in the subject warehouse.  Many items were shrink-wrapped in the subject warehouse. |
| [(c) Van Heel Depo., Ex. 312 at | [Charles Garavitt Declaration ¶ |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| 162:9-163:3, 212:7-25 (Van Heel testimony that the pallets looked like page 2 of Ex. 240); Ex. 240 at p. 2.] | 35.] |
| (d) **Mat Boards**:  At least some of the mat boards were distinctively packaged in a single, tall cardboard container (rather than in individual smaller boxes) that were bound with metal straps, like the pallet shown on page 3 of Ex. 239.<br><br>[(d) Van Heel Depo., Ex. 312 at 182:18-183:23, 205:5-9 (identifying page 3 of Ex. 239 as representative of the mat board).] | (d) Disputed.  Many of the mat boards were shrink wrapped for transportation, so they would not appear distinctively packaged to someone who was not already familiar with what was being shrink wrapped.  Mr. Van Heel described what he saw in a different warehouse, not the subject warehouse.<br><br>[Charles Garavitt Declaration ¶ 35.] |
| (e) **Poster Board/Tag Board**: All of the alleged 1 million sheets of poster board (aka tag board) was packaged in pallets that looked like the photo of page 2 of Ex. 239 – namely, a single 5'-6' tall box rather than a stack of smaller boxes, with 10,000 sheets of poster board/tag board on each pallet.<br><br>[(e) Van Heel Depo., Ex. 312 at | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| 200:15-203:23.] | |
| 44.     None of the pre-fire photographs show pallets of merchandise matching Mr. Van Heel's description of the mat boards, posters, poster board/tag board, or picture frames.<br><br>          [Ex. 7 (pre-fire photos); Van Heel Depo., Ex. 312 at 261:21-263:9 (Mr. Van Heel reviewed pre-fire photos and was unable to identify any pallets of these items).] | Disputed. The photos do not show the entire contents of the warehouse and it is impossible to determine from the photos what is inside some of the boxes.<br>          [Charles Garavitt Declaration ¶ 36.] |

**C.     Fake Shipping Documentation**

| | |
|---|---|
| 45.     In support of its claim, CGL submitted numerous bills of lading and packing lists purporting to show shipments of merchandise to its Palmdale warehouse on various dates before the fire, and bearing the signatures of Ron Van Heel (the shipping manager) and Cesar Sosa (the Palmdale warehouse manager). | Undisputed. |

**39**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| [*See*, *e.g.*, Ex. 136B, pp. 21-24; Ex. 136D, pp. 9-10; Ex. 136E, pp. 6-7; Ex. 136F, pp. 13-15; Ex. 136G, pp. 97-171; Ex. 136H, pp. 57-70; Ex. 136I, pp. 45-60; Ex. 136J, pp. 15-16; Ex. 136K, pp. 25-46; Ex. 136L, pp. 10, 18-19, 29-30, 38-39, 47-48, 57-58, 67-68, 77-78, 88-89, 98, 107-108, 117-118; Ex. 136M, p. 5.] | |
| 46. When asked about several of these documents, CGL told OneBeacon that they were created and signed on the pre-fire dates shown on the documents.<br><br>[(i) Ron Van Heel 11/18/2013 Examination Under Oath, Ex. 303 at 125:16-127:1 and Ex. 136E, pp. 6-7 (documents for poster board/tag board);<br><br>(ii) Ron Van Heel 11/25/2013 Examination Under Oath, Ex. 305 at 520:18-521:9 and Ex. 136M. pp. 4-5 (documents for pre-fabricated | Disputed. CGL never made any such representation. An employee of CGL who is not an officer, director or manager, testified to the best of his ability but did not have perfect memory. Mr. Van Heel was shown a few bills of lading out of context and did not detect the difference between these and the original set from which these were created. He was not shown the original set nor was the subject ever brought up in this examination. Had counsel asked him about it, he would have recognized |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| frames); | his error and correctly identified the bills of lading, as he did at a subsequent deposition when he was asked in a context that was not deceptive. There is nothing nefarious or deceptive about this employee's testimony nor is the bill of lading in any way inaccurate. His memory was merely inaccurate and, in any event, that cannot be attributed to his employer. |
| (iii) Ron Van Heel 11/25/2013 Examination Under Oath, Ex. 305 at 547:2-15 and Ex. 136J, pp. 15-16 (documents for posters and mat boards).] | |
| | [Van Heel Dec. ¶13.] |
| 47.     CGL told OneBeacon that the "item codes" that appear on many of the packing lists came from a list of item codes that existed at least as early as December 16, 2011. | Disputed. CGL never made any such representation. An employee of CGL who is not an officer, director or manager, testified to the best of his ability but did not have perfect memory. His inaccuracy is not attributable to CGL nor is it fraud, in any event. |
| [Ron Van Heel 11/18/2013 Examination Under Oath, Ex. 303 at 133:6-135:22.] | [Van Heel Dec. ¶13.] |
| 48.     All the CGL-generated bills of lading submitted by CGL with its claim | Undisputed that the specific bills of lading cited to contain a number |

**41**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| submissions have a bill of lading number beginning with the digits "62" – a numbering convention that CGL did not begin using until *after* the fire.<br><br>　　　[Van Heel Depo., Ex. 312 at 276:13-277:11 and 278:5-11 (admission that all bills of lading beginning "62" were created by him after the fire); Ex. 136B, pp. 21-23; Ex. 136D, p. 9; Ex. 136E, p. 6; Ex. 136F, p. 13; Ex. 136G, pp. 97, 99, 101, 103, 105, 107, 109, 111, 113, 116, 118, 120, 123, 125, 127, 129, 131, 133, 135, 137, 139, 141, 143, 145-146, 148, 150, 152, 154, 156, 158, 160, 162, 164, 166, 168, & 170; Ex. 136H, pp. 57, 59, 61, 63, 65, 67, & 69; Ex. 136I, pp. 46, 48, 50, 52, 54, 56, 58, & 60; Ex. 136J, p. 15; Ex. 136K, pp. 25, 27, 29, 31, 33, 35, 37-38, 41, 43, & 45; Ex. 136L, pp. 18, 29, 38, 47, 57, 67, 77, 88, 98, 107, & 117; and Ex. 136M, p. 4.] | beginning with "62".  Undisputed that the code "62" was implemented after the fire.  Disputed that these were the only documents provided.  Throughout the claim process, CGL provided OneBeacon all documents in its possession.  CGL provided whatever documents from the original set were in its possession.  The fact that OneBeacon has some originals without the codes, which it does, demonstrates that documents from this set were provided to OneBeacon.  There was no effort to mislead OneBeacon.  The original set of bills of lading are identical to the coded ones, except that codes were added for purposes of computerizing the invoices.<br><br>　　　[Van Heel Dec. ¶10-11, 13.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

### Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 49.    All the CGL-generated packing lists submitted by CGL with its claim submission have a packing list number beginning with the digits "22" – a numbering convention that CGL did not begin using until after the fire – and were not created until after the fire. Further, most of the packing lists that CGL gave OneBeacon in support of its claim contained a column entitled "item code" with item codes entered in that column.  CGL did not create packing lists with an item code column and did not start entering item codes into such a column until *after* the fire. [Van Heel Depo., Ex. 312 at 276:13-277:11 and 278:5-11 (admission that all packing lists beginning "22" were created by him after the fire), 236:25-237:3 and 242:25-243:20 (general admission that all packing slips with item codes or a column entitled "item code" were created after the fire), | Undisputed that the specific packing slips cited to contain a code beginning with "22".  Undisputed that the code "22" was implemented after the fire. Disputed that these were the only documents provided.  Throughout the claim process, CGL provided OneBeacon all documents in its possession.  CGL provided whatever packing slips from the original set were in its possession. There was no effort to mislead OneBeacon.  The original set of packing slips are identical to the coded ones, except that codes were added for purposes of computerizing the invoices. [Van Heel Dec. ¶10-11, 13.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

## Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations

| Uncontroverted Fact | Opposition |
|---|---|
| 239:20-240:2 (specific admission re medical supply packing list), 241:2-20 (specific admission re jewelry packing slip); Ex. 136B, pp. 22 & 24 [backdated medical supply packing list submitted by CGL]; Ex. 136D, p. 10 [backdated jewelry packing list submitted by CGL]. | |

*See also* all the packing lists submitted by CGL with its claim submissions: Ex. 136B, pp. 22 & 24; Ex. 136D, p. 10; Ex. 136E, p. 7; Ex. 136F, pp. 14-15; Ex. 136G, pp. 98, 100, 102, 104, 106, 108, 110, 112, 114-115, 117, 119, 121-122, 124, 126, 128, 130, 132, 134, 136, 138, 140, 142, 144, 147, 149, 151, 153, 155, 157, 159, 161, 163, 165, 167, 169 & 171; Ex. 136H, pp. 58, 60, 62, 64, 66, 68 & 70; Ex. 136I, pp. 45, 47, 49, 51, 53, 55, 57 & 59; Ex. 136J, p. 16; Ex. 136K, pp. 26, 28, 30, 32, 34, 36, 38, 40, 42, 44 & 46; Ex. 136L, pp. 10, 19, 30, 39, 48, 58, 68, 78-79, 89, 108 & 118; Ex. 136M, p. 5.]

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It
Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 50.    After the fire, CGL (i) created the bills of lading beginning with "62" and the packing lists beginning with "22", (ii) backdated them to dates before the fire, and (iii) signed them with the backdated date. | Disputed as to the term "backdated". These were duplicates of original bills of lading and packing lists created as part of computerization project.  As far as CGL is aware, OneBeacon was provided all documents available, including original bills of lading and packing slips.  OneBeacon used some |
| [Van Heel Depo., Ex. 312 at 276:13-277:11 and 278:5-11 (admission that all bills of lading beginning "62" and all packing lists beginning "22" were created by him after the fire), 236:25-237:3 and 242:25-243:20 (general admission that all packing slips with item codes or a column entitled "item code" were created after the fire), 239:20-240:2 (specific admission re medical supply packing list), 241:2-20 (specific admission re jewelry packing slip), and 277:12-23 (admission that he had Mr. Sosa sign them after the fire).] | original documents in its depositions, thus demonstrating that it had original documents, as well.  The documents created as part of the computerization project are identical to the original documents except for the computer codes.  The difference is not material and there was no effort or intent to deceive OneBeacon. |
| | [Van Heel Dec. ¶10-11, 13; ] |
| 51.    After CGL created the backdated | Disputed as to the term "backdated". |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| bills of lading and packing lists, Palmdale warehouse manager Cesar Sosa signed the documents with the backdated dates. For example, the bill of lading and packing slip at pages 21-22 of Ex. 136B which bear Mr. Sosa's signature and the date November 18, 2011 were in fact signed by Mr. Sosa after the May 15, 2012 fire.<br><br>[Van Heel Depo., Ex. 312 at 277:12-23; Ex. 136B, pp. 21-22.] | These were duplicates of original bills of lading and packing lists created as part of computerization project. As far as CGL is aware, OneBeacon was provided all documents available, including original bills of lading and packing slips. OneBeacon used some original documents in its depositions, thus demonstrating that it had original documents, as well. The documents created as part of the computerization project are identical to the original documents except for the computer codes. The difference is not material and there was no effort or intent to deceive OneBeacon.<br><br>[Van Heel Depo., Ex. 312 at 48:22-49:13; Van Heel Dec. ¶4-10; Charles Garavitt ¶53-55.] |
| 52. At the time that he shipped merchandise from CGL's Vernon or Cerritos warehouses to its Palmdale | Disputed. Mr. Van Heel states expressly that it was not a perfect system and there were flaws in it. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| warehouse, CGL's shipping manager created certain shipping documentation and placed the originals into what he called his "Palmdale Files" (one for shipments from Cerritos to Palmdale, one for shipments from Vernon to Palmdale, and one for shipments from a City of Industry to Palmdale).<br><br>[Van Heel Depo., Ex. 312 at 48:22-49:13, 59:10-60:6, 66:16-67:14, 71:6-20.] | [Van Heel Depo., Ex. 312 at 48:22-49:13] |
| 53.   For each shipment to Palmdale, the original Palmdale File typically contained: | Disputed that full documentation existed for each shipment. Mr. Van Heel expressly testified that the system was flawed.<br><br>[Van Heel Depo., Ex. 312 at 48:22-49:13] |
| (a)   An original transportation invoice (like the exemplar at page TT00001 of Ex. 236) signed by the | Disputed that full documentation existed for each shipment. Mr. Van Heel expressly testified that the system was flawed.<br><br>[Van Heel Depo., Ex. 312 at 48:22- |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| trucker at the point of origin (either Vernon or Cerritos). | 49:13] |
| [(a) Van Heel Depo., Ex. 312 at 31:21-32:25, 65:16-66:5, 78:12-20; Ex. 236 at p. TT000001.] | |
| (b) An original bill of lading (like the exemplar on page 58 of Ex. 136I) signed by Mr. Van Heel and by the trucker. | Disputed that full documentation existed for each shipment. Mr. Van Heel expressly testified that the system was flawed. |
| [(b) Van Heel Depo., Ex. 312 at 40:25-41:25, 44:8-45:11, 65:16-66:5; Ex. 136I at p. 58.] | [Van Heel Depo., Ex. 312 at 48:22-49:13] |
| (c) packing lists and bills of lading countersigned in Palmdale by the Palmdale warehouse manager, Cesar Sosa, that were subsequently sent down to Mr. Van Heel to maintain in his file. | Disputed that full documentation existed for each shipment. Mr. Van Heel expressly testified that the system was flawed. |
| [(c) Van Heel Depo., Ex. 312 at 45:25-46:14, 58:3-60:6, 65:16-66:5, 74:18-75:24.] | [Van Heel Depo., Ex. 312 at 48:22-49:13] |
| (d) a driver receipt. | Disputed that full documentation existed for each shipment. Mr. Van Heel |
| [(d) Van Heel Depo., Ex. 312 at | for each shipment. Mr. Van Heel |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| 65:16-66:5.] | expressly testified that the system was flawed.<br><br>[Van Heel Depo., Ex. 312 at 48:22-49:13] |
| 54.    The bills of lading and packing list that CGL generated before the fire are easily distinguishable from the backdated documents because they used a numbering system that reflected the date of the shipment, rather than the numbering system using the digits "62" and "22."<br><br>[Van Heel Depo., Ex. 312 at 276:13-20; see also Ex. 236 at p. TT000001 (exemplar of a CGL shipping document with date-based numbering "112611-08," reflecting a shipment on November 26, 2011).] | Disputed.  The evidence cited by OneBeacon does not support the stated fact.  Rather, it shows that the documents are materially identical and easily confused.  The only difference is that the ones created as part of the computerization effort have different numbering.<br><br>[Van Heel Dec. ¶13.] |
| 55.    Mr. Van Heel gave his original shipping file with the legitimate, non-backdated records to either Charles or | Undisputed. |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It
Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| Dana Garavitt or to CGL's public adjuster, the Greenspan Company. [Van Heel Depo., Ex. 312 at 279:10-281:11.] | |
| 56.    All of the shipping documents that CGL gave OneBeacon were the backdated documents, and none were the original shipping documents. [Decl. of Alan Jones, ¶ 9. *See also* all the shipping documents submitted with CGL's claim submission, which all contain the "62" or "22" codes indicating that they are backdated: Ex. 136B, pp. 21-24; Ex. 136D, pp. 9-10; Ex. 136E, pp. 6-7; Ex. 136F, pp. 13-15; Ex. 136G, pp. 97-171; Ex. 136H, pp. 57-70; Ex. 136I, pp. 45-60; Ex. 136J, pp. 15-16; Ex. 136K, pp. 25-46; Ex. 136L, pp. 10, 18-19, 29-30, 38-39, 47-48, 57-58, 67-68, 77-78, 88-89, 98, 107-108, 117-118; Ex. 136M, p. | Disputed that none of the originals were provided to OneBeacon. Documents were regularly provided to OneBeacon as they were gathered.  As far as Plaintiff is aware, it provided all original documents to OneBeacon.  The fact that the set from the computerization project were used by Greenspan in the formal proof of loss is not indication that the originals were not provided.  CGL had no intent to hide the original set, which were materially identical to the set created for the computerization project. [Charles Garavitt Dec. ¶54-56.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| 5.] | |

**D.      Fake Title Documents**

| | |
|---|---|
| 57.     CGL presented Certificates of Transfer of Title to OneBeacon to prove that it had acquired title to the merchandise claimed as burned. [Charles Garavitt 3/11/2014 Examination Under Oath, Ex. 306 at 24:8-18; Ex. 136B, pp. 27 & 32; Ex. 136D, p. 6; Ex. 136E, p. 9; Ex. 136F, p. 29; Ex. 136H, p. 77; Ex. 136I, pp. 93, 95, 97, 99, 101, 103, 105, 107, 109 & 111; Ex. 136J, p. 23; Ex. 136K, p. 66; Ex. 136L, pp. 12, 20, 28, 40, 50, 60, 69, 81, 91, 100, 110, 120, 122 & 124; Ex. 136M, p. 7.] | Undisputed. |
| 58.     Mr. Garavitt repeatedly told OneBeacon that these transfer of title documents were created at the time they were dated. [Charles Garavitt 3/11/2014 | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| Examination Under Oath, Ex. 306 at 77:13-16 (as to July 6, 2010 certificate of transfer of title for medical supplies); 83:21:84:4 (as to September 15, 2010 certificate for medical supplies); 138:6-12 (as to July 30, 2011 certificate for fabric); 187:4-13 (as to March 6, 2012 certificate for fabric). | |
| *See also* Charles Garavitt 3/12/14 Examination Under Oath, Ex. 307 at 293:23-294:8 (as to March 20, 2010 certificate for art paper); 352:4-9 (as to May 30, 2011 certificate for mat boards and posters); 451:17-23 (as to June 19, 2010 certificate for clothing). | |
| *See also* Charles Garavitt 3/19/2014 Examination Under Oath, Ex. 308 at 496:3-499:2 (Mr. Garavitt's testimony that he has no reason to believe that the certificates of transfer of title were not created in the year that | |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|

they were dated).]

59.     In fact, at least some of the Certificates of Transfer of Title were backdated because expert handwriting analysis establishes they were filled out by Ron Van Heel, who did not start working at CGL until October 2011, but were dated and purportedly signed prior to Mr. Van Heel's employment. [Decl. of David Oleksow at ¶ 4 and Ex. B thereto [expert opinion that documents purportedly pre-dating Mr. Van Heel's employment were written by him].

*Compare* Ex. 136D, p. 6; Ex. 136F, p. 29; Ex. 136I, p. 97; and Ex. 136L, pp. 12, 20, 40 & 110 [certificates of transfer of title with Ron Van Heel's admitted handwriting on them]; Van Heel Depo., Ex. 312 at 201:9-207:8 [Van Heel's admission to his handwriting on these

Disputed.  Mr. Van Heel provided services to CGL before becoming employed.  He provided services as a friend of Mr. Garavitt.  It was out of that voluntary service that he became formally employed with CGL.  He created all of the Certificates of Title on the dates indicated.

[Van Heel Dec. ¶1; Charles Garavitt Declaration ¶¶ 13-17.]

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

<u>Uncontroverted Fact</u>                                    <u>Opposition</u>

documents].

*With*

Ex. 136E, p. 9; Ex. 136H, p. 77; Ex. 136I, pp. 93, 95, 99, 101, 103, 105, 107, 109 & 111; Ex. 136K, p. 66; Ex. 136L, p. 91; and Ex. 136M, p. 7 [certificates of transfer of title with dates prior to Mr. Van Heel's employment].]

**E.    <u>False Claim For 100,000 Picture Frames</u>**

| | |
|---|---|
| 60.   CGL claimed the loss of over 2 million linear feet of wood molding.  [Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 166:5-167:4.] | Undisputed. |
| 61.   As of the date of the fire, CGL had a large quantity of Ramin wood molding stored outside the Palmdale building that suffered water and smoke damage from the fire, but did not burn. | Disputed.  The post-fire inventory lacks foundation.  Photos and video of the wood after the fire demonstrate that it cannot possibly be counted.  The images are reminiscent of a holocaust, with |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| A post-fire inventory of this wood molding showed that there was only 841,262 linear feet of molding.<br><br>[Decl. of Robert Krier, ¶ 9; Ex. 298 (Greer & Kirby salvage inventory for molding); Ex. 299 (forensic accountant report for molding).] | wood splintered and crushed into enormous mounds that could never be accurately inventoried. CGL provides direct testimony of the amount of wood (2 million linear feet).  OneBeacon's post-fire calculation is just some evidence that creates an issue of fact. [Charles Garavitt Dec. ¶63, Ex. 376, 377. ] |
| 62.    Mr. Garavitt and his agents Thomas Rowley (attorney) and Bill Rake  (public adjuster) gave the following explanation for the missing approximately 1.2 million feet of molding: | Disputed that any testimony was offered as an explanation for "missing" molding.  The testimony cited does not refer to any missing molding. |
| (a) CGL acquired the 2 million feet of molding, carefully counted it, and entered that count into a computerized inventory;<br><br>[(a) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 166:5-167:4] | Undisputed except that it is disputed this is an explanation for "missing" molding, which is not referred to in any way in the cited testimony. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| (b) later, after buying 1.4 million posters, CGL decided to use the molding to create frames for the posters and contracted with a company in Panama to sell it 1.4 million framed posters;<br><br>[(b) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 167: 5-21.] | Undisputed, except disputed that this is an explanation for "missing" molding. The issue of missing molding was never discussed in the cited testimony. |
| (c) to fulfill that contract, it hired two Mexican laborers to make frames out of the 2 million-plus foot supply of molding, using exclusively the more expensive Ramin wood for this purpose.<br><br>[(c)  Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 174:8-23, 177:6-13, 179:6-16.] | Disputed. Both as to substance and disputed that this was an explanation any "missing" molding.  The very next line of testimony from that cited by OneBeacon explicitly states that CGL did not hire the labor, but it was hired by Martin Fierro, who was a partner in the deal.  The cited testimony does not refer to or discuss any "missing" molding.<br><br>[(c)  Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302, 177:14-178:10.] |
| (d) For every 150 to 200 frames made, the workers would create a pallet | Undisputed, except to dispute that this was made to explain any "missing" |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| of frames, and every time the workers had created 6 or 7 pallets of such frames CGL would count the completed frames and shrinkwrap the pallets.<br><br>[(d) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 176:17-177:2] | molding.  The cited testimony contains no reference to missing molding. |
| (e) CGL then recorded the completed frames in a computerized inventory as "finished frames."<br><br>[(e) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 178:7-179:16.] | Undisputed, except to dispute that this was made to explain any "missing" molding.  The cited testimony contains no reference to missing molding. |
| (f) by the date of the fire, the two Mexican laborers had made 100,000 frames – with fewer than 10,000 having been made at the Vernon warehouse and the rest having been made at the Palmdale warehouse,<br><br>[(f) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 172:16-173:6, 175:1-6, 182:12-15, 185:4-10, 186:5-11] | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| (g) Mr. Garavitt knew that 100,000 frames had been completed because he paid the workers weekly and the completed frames were counted every time CGL paid.<br><br>[(g) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 166:5-167:4] | Undisputed. |
| (h) Almost all the 100,000 completed picture frames were stored in the back (warehouse) portion of the Palmdale building at the time of the fire.<br><br>[(h) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 182:2-22.] | Undisputed. |
| (i) The completed frames were burned up in the fire.<br><br>[(i) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 172:16-173:6.] | Disputed that CGL made that factual representation, though it is logical to conclude that wood stored inside the warehouse may have burned in the fire. The cited evidence does not support that fact. The transcript portion to which OneBeacon cites is not sworn testimony but colloquy between counsel and a |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| | third party, not the witness under oath. It was speculation on the part of all and not a fact being presented to the carrier who had its own fire investigators and others examine the scene. |
| (j) because each frame required 12 feet of molding, the 100,000 burned up frames accounts for the approximately 1.2 million foot difference between the 841,000 feet found by Greer & Kirby and the 2 million feet claimed as burned.<br><br>[(j) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 171:10-16.] | Disputed that CGL made that factual representation, though it is a logical conclusion. The cited evidence does not support that fact. The transcript portion to which OneBeacon cites is not sworn testimony but colloquy between counsel and a third party, not the witness under oath. It was speculation on the part of all and not a fact being presented to the carrier who had its own fire investigators and others examine the scene. |
| 63.    In further support of the 100,000 picture frames story, CGL submitted a declaration procured by its attorney/agent Thomas Rowley and signed by Martin Fierro attesting that | Undisputed that the aforesaid declaration was submitted. Disputed that it was submitted to support a "story". The cited evidence does not support that fact. |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It
Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| 100,000 frames had been made by the Mexican laborers.<br><br>[Decl. of Robert Krier, ¶ 9; Ex. 41 [declaration asserting manufacturer of 100,000 frames].] | |
| 64.    Palmdale warehouse manager Cesar Sosa – who worked 60 hours a week in the Palmdale building – does not remember anyone building picture frames at the Palmdale facility.<br>[Cesar Sosa Depo., Ex. 309 at 224:8-21.] | Disputed.  The term "building picture frames" does not correctly describe the activity which would have been seen, which would have merely been cutting molding into the pieces to be later assembled by the international purchaser into picture frames.  No one asked Mr. Sosa if he saw laborers outside the back of the warehouse cutting molding.  CGL presents direct testimony that laborers did cut the frames outside in the wood storage area of the warehouse.  Photos of the outside storage area confirm this by showing the table saw purchased for that purpose.<br><br>Additionally, Mr. Sosa is not a reliable |

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| | witness.  He was not an employee of CGL and his statements are not admissions.  He demanded money from CGL just before his testimony, which CGL refused, and he has made multiple legal claims against CGL subsequently for purported labor and wage violations.  Mr. Sosa was and extremely biased witness during his deposition. [Charles Garavitt Declaration ¶¶ 37-40.] |
| 65.    After Mr. Sosa testified, Mr. Garavitt changed his story about the 100,000 frames.  In particular, Mr. Garavitt now claims: [Charles Garavitt Depo., Ex. 311 at 261:21-283:24.] | Disputed.  Mr. Garavitt testified consistently.  The issue is whether the "finished" frames were "assembled".  Mr. Garavitt testified that, at first, the workers were instructed to cut the wood into frames and then staple the frames together.  However, it quickly became clear that it would cost too much to store and ship assembled frames internationally to the buyers.  After completing only three to five pallets of |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| Uncontroverted Fact | Opposition |
|---|---|
| | finished and assembled frames, the workers were instructed to cut the rest of the molding into frames but not assemble them.  To Mr. Garavitt, that was finished.  The workers were paid for their work and the frames were ready for shipping.  Mr. Garavitt and the buyer agreed to slightly discount the price to account for the buyer receiving unassembled frames as opposed to assembled frames.  That testimony is not inconcistent with prior testimony. The issue of what constituted completed frames was not previously raised. [Ex. 311 at 264:24 – 269:1; Charles Garavitt Declaration ¶¶ 59-61.] Disputed.  The cited testimony expressly states that this is just a rough estimate, that it was "something like that".  It might have been 6 or 7 pallets. [Ex. 311 at 269: 12-20 (discussing that it might have been 6 or 7 pallets).] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground # 1: CGL's Complaint Is Barred Because It Made Intentional Material Misrepresentations**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| (b) as to the remainder of the 100,000 frames, the laborers had only cut lengths of molding to the correct length, but not assembled the cut pieces into completed frames.<br><br>[(b) Charles Garavitt Depo., Ex. 311 at 279:12-17] | Undisputed. |
| (c) the pre-cut lengths of Ramin molding sufficient to make 100,000 frames were not in fact inside the Palmdale warehouse, but were stored outside the warehouse along with the other (unburned) molding.<br><br>[(c) Charles Garavitt Depo., Ex. 311 at 281:4-22.] | Undisputed. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It
Breached Its Duty to Provide Books and Records**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 66.  CGL's OneBeacon policy contains the following provision obligating it to produce books and records:<br><br>    **"DUTIES IN THE EVENT OF LOSS OR DAMAGE**<br><br>    1. You must see that the following are done in the event of loss covered under this Coverage Part: . . .<br><br>    f. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records."<br><br>[Ex. 255 at P 000109 – P 000110.] | Undisputed. |

**A.  <u>Electronic Records</u>**

| | |
|---|---|
| 67.  Ron Van Heel used a Gateway desktop PC to create every bill of lading, packing list, and transportation invoice generated by CGL for shipments to Palmdale. | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
| --- | --- |
| [Van Heel Depo., Ex. 312 at 77:15-78:11.] | |
| 68.     Early in the claim, Charles Garavitt told OneBeacon that CGL from the time it started doing business it (i) counted all goods purchased upon receipt, (ii) did a monthly inventory check thereafter, and (iii) kept the inventory information in computer form listing CGL's monthly inventory by number of pallets and number of pieces for each item of inventory.  For example, the monthly inventory would show a certain number of pallets of art paper in Cerritos until the time the art paper was shipped to Palmdale, and then would show zero pallets remaining in Cerritos.           [Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 112:24-119:24 [general description of monthly inventory | Undisputed. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| Uncontroverted Fact | Opposition |
|---|---|
| system]; 189:16-24 [representation that same inventory tracking system applies to the posters and mat boards]; 203:21-204:3 [description of the inventory system using art paper as an example]; 167:2-4 [representation that Ramin wood was added to the computer inventory when received].] | |
| 69.    Ron Van Heel used his Gateway desktop PC to create all the computerized inventory records he prepared prior to the fire.<br>        [Van Heel Depo., Ex. 312 at 94:6-95:5.] | Undisputed. |
| 70.    The pre-fire inventory records on Mr. Van Heel's Gateway desktop PC covered approximately half (or "maybe a little more") of CGL's inventory.<br>        [Van Heel Depo., Ex. 312 at 108:7-110:18.] | Undisputed. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 71.    In letters dated December 28, 2012, February 19, 2013, and March 15 2013, OneBeacon asked CGL to preserve its computerized records, including twice offering to pay the cost of having a forensic computer specialist duplicate CGL's electronic records.<br><br>[Decl. of Alan Jones, ¶ 7; Decl. of Robert Krier, ¶ 13; Ex. 262 (asking CGL to "take all means necessary to preserve its business records," including "duplicat[ing] its computer hard drives as they exist[ed] . . . ."); Ex. 263 (February 19, 2013 letter) at p. 8 (requesting preservation of records and offering to forensically duplicate at OneBeacon's cost); Ex. 264 (March 15, 2013 letter) at p. 1 (same).] | Undisputed. |
| 72.    CGL did not respond to OneBeacon's the requests to preserve electronic records made by OneBeacon in the December 28, 2012, February 19, | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| 2013, and March 15 2013 letters.<br><br>    [Decl. of Alan Jones, ¶ 7; Decl. of Robert Krier, ¶ 13.] | |
| 73.    CGL did not provide OneBeacon with electronic versions of its shipping and inventory records nor give OneBeacon access to the electronic records.<br><br>    [Declaration of Alan Jones, ¶ 7; Decl. of Robert Krier, ¶ 13.] | Disputed.  CGL did not have electronic documents by the time they were requested.  The documents were maintained on the personal computer of an employee, Mr. Van Heel.  His computer crashed in the summer of 2012 and the data was lost.  Neither Mr. Van Heel, nor CGL for that matter, are sophisticated with respect to electronic record keeping.  Mr. Van Heel did not have back-ups of his data.<br><br>    [Van Heel Dec. ¶7-9.] |
| 74.    In the summer of 2013, CGL threw away the Gateway desktop PC on which he maintained CGL's shipping and inventory records without having transferred the electronic data onto any other electronic media. | Disputed.  CGL did not discard any computer.  The computer in question was the personal property of Mr. Van Heel.  It crashed in 2012.  He discarded it without asking or informing CGL.  Even though the computer is Mr. Van |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| <u>Uncontroverted Fact</u> | <u>Opposition</u> |
|---|---|
| [Van Heel Depo., Ex. 312 at 245:9-18, 250:16-18.<br><br>   Van Heel November 19, 2013 Examination Under Oath, Ex. 304 at 307:21-309:2 (admission that he last saw the computer in the summer of 2013, then threw it away for recycling without backing up any of the data).] | Heel's personal property, upon receiving the first letter, CGL inquired and learned the computer had failed.<br><br>   [Van Heel Dec. ¶7-9.] |

**B.**  <u>**Hard Copy Shipping Records**</u>

| 75. At the time of the fire, CGL's shipping manager Ron Van Heel had a "Palmdale File" that contained hard copy originals of CGL's bills of lading and packing slips for merchandise shipped to Palmdale.  (*C.f.* Facts 52 and 53 for a more detailed statement.) [Van Heel Depo., Ex. 312 at 48:22-49:13, 59:10-60:6, 66:16-67:14, 71:6-20.] | Disputed that the documents are "originals".  Mr. Van Heel was asked if he created and kept "copies" in his file. These are documents printed from a computer printer, so there is no "original" and the original is indistinguishable from a copy.<br><br>   [Ex. 312 at 59:10-13.] |

| 76. After the fire, Mr. Van Heel gave | Disputed. The cited testimony does not |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| Uncontroverted Fact | Opposition |
|---|---|
| the original "Palmdale File" to Charles or Dana Garavitt or to The Greenspan Company.<br><br>[Van Heel Depo., Ex. 312 at 279:10-281:11.] | support the stated fact. Mr. Van Heel testified that he did not remember what he did with the his file, but that because he does not have it, he most likely gave it to Sheri at The Greenspan Company. He does not remember giving it to Dana.<br><br>[Van Heel Depo., Ex. 312 at 280:18-281:1.] |
| 77.   CGL did not give OneBeacon the original, unaltered documents in the "Palmdale File."<br><br>[Decl. of Alan Jones, ¶ 9. ] | Disputed.  OneBeacon did not request the file in its original form before denying the claim or ever.  CGL provided documents to Greenspsan throughout the process of the claim and Greenspan regularly gave documents to OneBeacon.  Because no one asked for the file to be preserved in its original form, it is possible the documents were grouped with other documents and provided in that manner.<br><br>[William Rake Declaration ¶ 15.  Charles Garavitt Declaration ¶ 64.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| Uncontroverted Fact | Opposition |
|---|---|
| 78.     During the claim, CGL produced printouts of purported pre-fire computerized inventory records only for a few items, far fewer than the amount of inventory records that Mr. Garavitt and Mr. Van Heel said had been created in computerized form. | Disputed.  CGL provided whatever it still had.  It also provided shipping documents showing all of the merchandise going first to the Cerritos warehouse and provided original documents whenever requested if they still existed. |
| [Decl. of Robert Krier, ¶¶  13, 18(xii); Decl. of Alan Jones, ¶ 3.] | [Charles Garavitt Declaration ¶ 64. William Rake Declaration ¶ 15.] |

**C.     Prejudice**

| | |
|---|---|
| 79.     CGL's destruction of its electronically-stored shipping and inventory information and its failure to produce the original bills of lading and packing slips in Ron Van Heel's "Palmdale File" prejudiced OneBeacon's investigation. | Disputed.  First, OneBeacon never requested the original Palmdale file, even after taking Ron Van Heel's deposition.  If the file had been critical, OneBeacon would have requested long ago. |
| [Decl. of Robert Krier, ¶ 13; Decl. of Alan Jones, ¶ 8.] | Second, other than a request to preserve the electronic evidence, OneBeacon never sought to actually schedule any |

**71**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| Uncontroverted Fact | Opposition |
|---|---|
| | examination of it.  OneBeacon did not know that the computer had become inoperable until shortly before filing this motion.  The request to preserve followed by no action is a pattern with OneBeacon.  It did the same with another computer which, in fact, was preserved.  Nevertheless, when CGL followed up to see when it would be examined, OneBeacon passed and decided it did not need to examine it.

Third, CGL provided OneBeacon with extensive documentation evidencing the entire chain of all of the goods including bills of lading from the Alcoa/Vernon warehouse to Cerritos, where many of the goods first went, then from Cerritos to Palmdale.  CGL also produced invoices for all of the goods from the sellers who sold them to CGL.  OneBeacon directly obtained back-up from the sellers showing where they |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| Uncontroverted Fact | Opposition |
|---|---|
| | purchased many of the goods and showing they did in fact sell the goods to CGL, Inc.  CGL also provided extensive bank statements supporting the purchase of the items. OneBeacon also inspected the other CGL warehouses and obtained records regarding those warehouses to confirm that the goods were not still in any of those warehouses.  CGL was completely transparent and provided whatever documents it had available.  It did not refuse to provide these documents, but rather the computer on which they were stored malfunctioned and became inoperable before the documents were ever requested.  The computer was not property of CGL and CGL was not consulted before it was discarded.  Even so, CGL inquired when asked for the information and learned that it was no longer available. OneBeacon cites to no evidence showing how its questions |

**Full Summary Judgment Ground #2: CGL's Complaint Is Barred Because It Breached Its Duty to Provide Books and Records**

| Uncontroverted Fact | Opposition |
|---|---|
| | with respect to any particular item could have been resolved by those records. Nor is there any foundation to support the claim that metadata on the computer could have resolved issues about when the invoices were created. Metadata is a complex subject and requires an expert to examine it and interpret it. OneBeacon has provided no such expert testimony and any testimony it has provided is completely without foundation. |
| | [William Rake Declaration ¶ 15. Charles Garavitt Declaration ¶ 64. Van Heel Declaration ¶10-11. Exs. 256 through 283 (letters showing the massive amount of documents requested by OneBeacon and produced by CGL throughout the claims process).] |

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied
Covenant of Good Faith and Fair Dealing is Barred Because There Was a
Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|

**A.     OneBeacon Conducted a Reasonable Investigation**

| | |
|---|---|
| 80.    **Experts**: Within a couple days to several weeks of the fire, CGL retained experts to assist in evaluating the claim, including: (i) a salvage company to inventory everything that survived the fire, (ii) experts to help evaluate CGL's claims for lost fabric and lost wood molding, (iii) a forensic accountant to help analyze CGL's business records and financial condition, (iv)  fire cause and origin experts to investigate the cause of the fire, and (v) an attorney to assist with examinations under oath.<br><br>[Decl. of Robert Krier, ¶ 4.] | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| 81.  **Documents**:  Beginning on May 21, 2012 and continuing throughout the claim, OneBeacon repeatedly requested documentation from CGL material to the evaluation of its claim, including (i) purchase invoices showing what CGL acquired, (ii) inventory records showing what was still in stock as of the time of the fire, (iii) shipping records showing what portion of that remaining stock was in Palmdale, (iv) financial records relevant to potential motive for arson, and (v) inspection of samples of allegedly lost inventory.<br><br>[Decl. of Robert Krier, ¶ 6; Exs. 256 through 283 (letters repeatedly requesting production of documents and reminding CGL of documents that had not been produced, and seeking to inspect exemplars of allegedly lost inventory).] | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| 82.  **Delay by CGL:** CGL's responses to OneBeacon's document requests were so dilatory that its own public adjuster, the Greenspan Company, warned it that OneBeacon might deny the claim for lack of cooperation.<br><br>          [Exs. 97 & 99; Deposition of William Rake as PMK for the Greenspan Company, Ex. 316 at 111:8-112:20 and 116:15-117:19 [testimony regarding warnings to CGL and authentication of exhibits 97 and 99].] | Disputed.  The cited evidence does not support that fact.  In the evidence cited by OneBeacon, CGL's public adjuster testified he did not recall what was in his mind when he wrote the letters and there is no testimony in the cited excerpts about what the actual state of producing documents was at the time the emails were written.  There is no evidence cited by OneBeacon that the production was "so dilatory" that "OneBeacon might deny the claim for lack of cooperation."<br><br>          [Deposition of William Rake, Ex. 316 at 112:2-4.] |
| 83.  **Initial Meeting**:  On June 7, 2012, OneBeacon met in person with CGL and its lawyer Thomas Rowley and public adjuster Bill Rake of The Greenspan Company to discuss the claim. | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| [Decl. of Robert Krier, ¶ 7.] | |
| 84.  **Cerritos Inventory Inspection:** Because the fire authorities did not allow access to the loss location for several weeks after the loss, salvage expert Greer & Kirby began its investigation on May 29, 2012 by taking inventory of the goods in CGL's Cerritos warehouse.  It provided a report to OneBeacon that showed contents in Cerritos that appears similar to items that CGL claimed were burned in the fire, including (i) hundreds of thousands of posters and poster prints, and (ii) approximately 6,000 units of cell phone accessories.<br><br>[Decl. of Robert Krier, ¶ 8; Ex. 297 (excerpts of Greer & Kirby's Cerritos Inventory Report).] | Disputed that the reports actually show similar items in Cerritos.  Krier's conclusion indicates that he received the reports and from those reports, concluded the items were similar.  However, there is nothing in the report – which is just a barebones summary - to support that conclusion.  Therefore, his conclusion is without foundation and evidence of bad faith.  Without any foundation other than a summary report, he concluded the insured was claiming goods that were in a different warehouse. |
| 85.  **Palmdale Salvage Inspection re Wood Molding**: After the authorities | Undisputed that salvage inspection began and reports were provided to |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| allowed access to the Palmdale building in mid-June 2012, Greer & Kirby began a salvage inspection of the identifiable items in the fire debris and of the wood molding (which had been stored outside the building and thus was not burned, but only suffered smoke and water damage) and provided reports to OneBeacon.  Among other things, the reports stated that there was only 841,262 linear feet of wood molding, not the 2 million plus fee claimed by CGL.<br><br>        [Decl. of Robert Krier, ¶ 9; Ex. 298 (portions of Greer & Kirby's Palmdale salvage inspection report for wood molding); Ex. 299 (forensic accountant's report concerning wood molding).] | OneBeacon.  Moreover, the report itself is dubious.  Photos of the wood show that it is splintered, mashed, soaked and piled into huge mountains of debris which are not susceptible of an accurate physical count.  OneBeacon has provided no photos or other support to demonstrate how a physical count of the debris left over after the fire was put out could in any way provide an accurate basis to deny or even forestall honoring the claim or portions thereof.<br><br>        [Ex. 299 at pg. 2, 1st paragraph; Charles Garavitt Declaration ¶ 63, Ex. 376-377. See also PAF[1] 121.] |
| 86.   **Fabric Inspection**: Greer & Kirby and fabric expert Umberto Tavira | Undisputed that these reports were provided.  Otherwise disputed.  The |

---
[1] Plaintiff's Additional Fact

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| inspected the surviving fabric and concluded that there was no finished fabric in the warehouse at the time of the fire and, instead, there was only less valuable greige (unfinished) fabric.<br><br>[Decl. of Robert Krier, ¶ 10; Ex. 300 (portions of Greer & Kirby's Palmdale salvage inspection report for fabric); Ex. 301 (forensic accountant's report concerning fabric).] | cited evidence does not support the facts contained in the reports. |
| 87.     **Fire Cause & Origin.** OneBeacon received a report by Sergeant Acevedo of the Los Angeles Sheriff's Department that concluded, among other things, that there was a "high probability" that the fire was intentionally set.  OneBeacon also received a report by expert Robert Jones concluding that the fire was deliberately set.  OneBeacon also received a transcript of a recording of a telephone | Undisputed that the reports were received.  Disputed with respect to the characterization of the transcript of the telephone call from Soci Mayor.  Read in context, she is clearly trying to confirm that the fire alarm is working because the owner is refusing to perform the balance of the work on it until he receives another check.  Clearly, she was worried about making sure it is functioning.  The fire department |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| call that CGL employee Soci Mayor made to CGL's alarm company the day before the fire in which inquired what would happen if the fire sprinkler water was shut off.<br><br>[Decl. of Robert Krier, ¶ 15; Ex. 291 (Sergeant Acevedo's report); Ex. 292 (Robert Jones's report); Ex. 293 (Soci Mayor transcript).] | ultimately concluded they could not determine cause or origin.<br><br>[Ex. 293 in its entirety [transcript of phone call]; Exhibit 291, pg. 785 (Det. Acevedo's report showing his interpretation of the recorded telephone conversation that the call was to confirm that the alarm would work) *See* also Exhibit 382, page 5, second paragraph (same as Defendant's Exhibit 291 in which Defendants **redact** the portion at which the fire investigator confirms Mr. Garavitt's statements regarding his whereabouts prior to and on the day of the fire using cell tower activity of his cell phone.  The official conclusion of Sergeant Acevedo of the Los Angeles Sherriff's Department is, ". . . I have been unable to determine a cause or point of origin for this fire." (Exhibit 382, page 5, second to last paragraph.  Though the report also says |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | that the fire was "highly suspicious" and that there is, "a high probability that it was deliberately set", there's no indication whatsoever who deliberately set it.  (Id.)] |
| 88.    **Opportunity to Commit Arson**. OneBeacon's investigation determined that (i) CGL had disabled the burglar alarm two days before the fire, (ii) only Mr. Garavitt and his associate Martin Fierro were in a position to know that the alarm had been disabled, (iii) Mr. Garavitt had keys to the building, and (iv) there was no evidence of forced entry into the building at the time of the fire.<br><br>          [Decl. of Robert Krier, ¶ 16.] | Disputed.  The report fails to contain any specific, credible, admissible evidence that CGL or Charles Garavitt was responsible in any way for the fire, and fails to consider in any way law enforcement's finding that Mr. Garavitt was somewhere else when the fire was started. Instead, it contains complete hearsay with only conclusions. Even the hearsay does not say anyone "disabled" the alarm, but rather forgot to turn it on the last time they were in the facility, two days before the fire.  Police determined that Mr. Garavitt was where he said he was at the time the fire was started.  He was not charged with any |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | crime and fire authorities concluded they could not determine cause or origin of the fire.  OneBeacon had to have arrived at its conclusion about arson more than a year before denying the claim on another basis.  Even though OneBeacon did not deny the claim on the basis of arson, OneBeacon threatened to claim arson if CGL sought to enforce its rights and sue for insurance benefits.  Threatening to accuse someone of a crime if they do not accept a benefits determination is a bad faith insurance practice in California. *See* Gruenberg v. Aetna Ins. Co. (1973) 9 C3d 566, 575. [Ex. 293 in its entirety [transcript of phone call]; Exhibit 291, pg. 785 (Det. Acevedo's report showing his interpretation of the recorded telephone conversation that the call was to confirm that the alarm would work)  *See* also |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| | Exhibit 382, page 5, second paragraph (same as Defendant's Exhibit 291 in which Defendants **<u>redact</u>** the portion at which the fire investigator confirms Mr. Garavitt's statements regarding his whereabouts prior to and on the day of the fire using cell tower activity of his cell phone.  The official conclusion of Sergeant Acevedo of the Los Angeles Sherriff's Department is, ". . . I have been unable to determine a cause or point of origin for this fire."  (Exhibit 382, page 5, second to last paragraph.) Though the report also says that the fire was "highly suspicious" and that there is, "a high probability that it was deliberately set", there's no indication whatsoever who deliberately set it.  (<u>Id.</u>) |
| 89.    **2012 Examinations Under Oath:**  After CGL failed for five months to produce most of the records requested | Disputed that OneBeacon took the examinations under oath because CGL failed to produce records.  OneBeacon |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| by OneBeacon, OneBeacon took the examination under oath (EUO) of Charles Garavitt as CGL's custodian of records on December 7, 2012.  CGL declined OneBeacon's request to make Palmdale personnel, including Soci Mayor or Palmdale warehouse manager Cesar Sosa, available for examination under oath.  Mr. Garavitt did not sign and return the transcript of the December 7, 2012 examination under oath until November 11, 2013.<br><br>[Decl. of Robert Krier, ¶ 11; Decl. of Alan Jones, ¶ 4.] | has already stated in Fact #80 that within days to weeks of the fire, it had already hired an attorney to take examinations under oath.  Accordingly, it planned to take these examinations from the beginning and did not take them as a result of any failure by CGL.  Also disputed that CGL would not make Cesar Sosa available; He was not employed by CGL.<br><br>Further, as set forth in Plaintiff's Additional Facts, *infra*, the examinations were conducted in an improper manner intended to build a case of fraud rather than evaluate Plaintiff's claim.<br><br>[*See* OneBeacon's Fact #80 above. Charles Garavitt Declaration ¶27.] |
| 90.   **2013-2014 Examinations Under Oath.**  After receiving some further | Undisputed. |

**Partial Summary Judgment Issue 1: CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| documents during 2013, OneBeacon asked to take the examinations under oath of Ron Van Heel and Charles Garavitt. Mr. Van Heel appeared for examination under oath in four sessions (November 18, 19, and 25, 2013 and February 13, 2014) and returned signed copies of his examination under oath transcripts on April 22 and April 24, 2012. OneBeacon took Mr. Garavitt's examination under oath in four sessions (March 11-12, 2014 and March 19-20, 2014) and Mr. Garavitt returned the signed transcripts of his examinations under oath on April 22, 2014. [Decl. of Robert Krier, ¶ 12; Decl. of Alan Jones, ¶ 5.] | |
| 91. **Sworn Statement in Proof of Loss**: CGL submitted its first sworn statement in proof of loss on or about November 29, 2013 and submitted an | Undisputed. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| amended sworn statement in proof of loss on March 20, 2014.<br><br>[Decl. of Robert Krier, ¶ 14; Exs. 288 and 290 (original and amended sworn statements in proof of loss).] | |
| 92.    Submitting a sworn statement in proof of loss and signing and returning transcripts of examinations under oath are both conditions precedent to an insured's right to be paid policy benefits.<br><br>[Policy Excerpts, Ex. 255 at P 000109 – P 000110 (see subsections C(1)(g) & C(2)).] | Disputed.  California law requires an insured to take steps to advance benefits as soon as possible after a loss, even if some parts of the claim are disputed, but other parts are not.  <u>Neal v. Farmers Ins. Exchange</u> (1978) 21 C3d 910, 921.  An insurer is not protected from bad faith claims where arson is suspected but law enforcement has not prosecuted the insured.<br><br><u>Lee v. Crusader Ins. Co.</u>, 49 Cal. App. 4th 1750, 1760 (1996) (holding that, where criminal charges are pending for arson, the insurer may withhold benefits pending the outcome, but expressly limiting its holding to cases in which |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | there have actually been criminal charges filed). |
| 93.  **Claim Submissions**: CGL submitted itemizations and valuations of its claims, along with certain allegedly supporting documents, in stages between November 2012 and March 2014 as follows:

(i)  On or about November 29, 2012, CGL submitted a claim itemization totaling $25,397,499 for the jewelry, art paper, hair products, rolled fabric, cell phone accessories, and medical supplies portion of its claim.

(ii) On January 25, 2013, CGL submitted a claim itemization totaling $10,224,032.32 as a partial statement of its claimed clothing loss, which it supplemented on February 14, 2013 | Undisputed. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|

with the addition of $188,280 for jeans.

(iii) On May 16, 2013, CGL submitted a claim itemization totaling $5,360,000 for mat boards (later increased to $16,480,00) and $1,250,540 for posters (later increased to $4,895,475.75).

(iv)  On December 2, 2013, CGL submitted a combined claim itemization totaling $62,601,850.62 and a notebook of allegedly supporting documents.

(v)  On March 20, 2014, submitted its amended and final claim itemization (now totaling over $70 million) and a set of allegedly supporting documents. The final claim itemization included the addition of about $10,000,000 for the alleged loss of 100,000 frames allegedly manufactured for CGL by two Mexican laborers from CGL's supply of wood

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| molding. | |
| [Decl. of Robert Krier, ¶ 14; Exs. 284-287 and 289 (relevant portions of November 212 through December 2013 claim submissions); Ex. 136(A)-(M) (final March 20, 2014 claim submission)] | |

**B.   <u>OneBeacon Reached a Reasonable Conclusion</u>**

| | |
|---|---|
| 94.   On May 8, 2014, OneBeacon sent CGL detailed denial letter summarizing the results of its investigation and denying the claim.<br><br>[Ex. 252; Decl. of Robert Krier, ¶ 18.] | Undisputed that OneBeacon sent a denial letter stating its purported reasons for the denial. |
| 95.   **Conflict With Shipping Records:** For several categories of items, the amount of product claimed by CGL were inconsistent with CGL's own shipping records because the quantity of product CGL claimed as burned far | Disputed.<br><br>The Greenspan Companies claim submission included backup for all of the items in the proof of loss.  The backup included purchase invoices, bills of lading, packing slips, and other |

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| exceeded the amount its own shipping records showed being sent to Palmdale.<br><br>[Decl. of Robert Krier, ¶ 18(v); Ex. 136D, pp. 9-10 (jewelry records); Ex. 136E, pp. 6-7 (tag board/art paper records); Ex. 136G, pp. 97-104 (fabric records); Ex. 136L, p. 10 (vitamin records).] | backup information from third parties which was unavailable at the time. Exhibit 136; 8-L; Declaration of Leo Vasquez entire declaration, and exhibits attached thereto (third party trucker testifying that he transported goods and providing additional shipping documents from individual truckers not available during the claim process.) |
| 96.  **Inconsistency with Warehouse Map**:  Many categories of CGL's claim – especially the large volume claims for mat boards, paper, and frames – were inconsistent with the warehouse map drawn by Cesar Sosa which tended to show that such items, if they existed at all, did not exist in the quantity claimed by CGL.<br><br>[*Compare* Exs. 136A-136M [claim submission] *with* Ex. 9 [warehouse map]; Decl. of Robert Krier, | Disputed that the Sosa map demonstrated that the items either did not exist or existed in quantities below those claimed.  The Sosa map was not accurate. Pre-fire photographs show that the warehouse was not organized in the manner depicted in the Sosa map.  The warehouse was so full before the fire that you could barely walk through it. There was no room for the wood which had to be put outside.<br><br>        Disputed both that the map is |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| ¶ 18(i).] | accurate and that it was drawn to the best of Mr. Sosa's recollection. |
| | The warehouse was much more filled than reflected in the map. The warehouse as so full, you could not walk through it.  At the time of the fire, the warehouse no longer had broad aisles and was filled to more than ten feet high and up to fifteen feet or more in some areas.  Mr. Sosa demanded money from CGL just before his testimony, which CGL refused, and he has made multiple legal claims against CGL subsequently for purported labor and wage violations and workers compensation.  Mr. Sosa was an extremely biased witness during his deposition. |
| | [Rojas Depo Exhibit 375. 109:20-110:14; Charles Garavitt Declaration ¶¶ 34-40.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| 97.   **Inconsistency With Loss Pre-Loss Photos:**  The volume of merchandise claimed by CGL – which OneBeacon was advised would have taken more than 50 truckloads for the mat boards alone – was not supported by the pre-loss photographs of the amount of goods in the warehouse.<br><br>        [*Compare* Exs. 136A-136M [claim submission] *with* Ex. 7 [pre-loss photos]: Decl. of Robert Krier, ¶ 18(i); Decl. of Alan Jones, ¶ 10.] | Disputed.  Pre-loss photos show the warehouse is packed full.  It was so full you could not walk through it and the wood had to be placed outside.  Disputed both that the map is accurate and that it was drawn to the best of Mr. Sosa's recollection.<br><br>The warehouse was much more filled than reflected in the map. The warehouse as so full, you could not walk through it.  At the time of the fire, the warehouse no longer had broad aisles and was filled to more than ten feet high and up to fifteen feet or more in some areas.<br><br>Mr. Sosa demanded money from CGL just before his testimony, which CGL refused, and he has made multiple legal claims against CGL subsequently for |

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
|  | purported labor and wage violations and workers compensation.  Mr. Sosa was an extremely biased witness during his deposition. <br><br> [Rojas Depo Exhibit 375. 109:20-110:14; Charles Garavitt Declaration ¶¶ 34-40.] |
| 98.    **Unreliable Purchase Invoices:** Multiple versions of the supporting invoice (GBUS invoice # 1376) were produced by CGL: one which listed 2 million sheets of poster board/tag board and 2 million sheets of art paper, one which listed only 1 million sheets of each, and one that was actually signed and that did not list *any* poster board/tag board or *any* art paper.  Mr. Garavitt admitted that the invoice for hair products had been generated *after* the fire. <br> [Decl. of Robert Krier, ¶ 18(ii).] | Disputed.  The only multiple invoices occurred because, after CGL tendered invoices as provided before the fire, OneBeacon requested that CGL obtain more detailed invoices.  CGL went back to the vendors and requested more detailed invoices, as instructed.  This naturally led to multiple invoices for the same inventory.  OneBeacon is now attempting to use those more detailed invoices to suggest impropriety. <br><br> [Charles Garavitt Declaration ¶ 64.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| [*Compare* Ex. 136E, p. 11 (version submitted in CGL's claim notebook, listing 1 million sheets of each); Ex. *With* Ex. 252, p. 46 (version listing 2 million sheets of each) and Ex. 252, p. 44 (signed version not listing any poster board/tag board or any art paper); Charles Garavitt 3/19/2014 Examination Under Oath, Ex. 308 at 604:15-607:9 (Mr. Garavitt admitting he verbally requested the invoice for the hair products after the fire); Ex. 136F, p. 6 [hair product invoice].] | |
| 99.  **Vague Purchase Invoices:** Many of the purchase invoices provided by CGL did not list a quantity of product and/or were for an amount that was | Undisputed that the cost of purchase was small compared to replacement cost. Disputed that this is a basis to deny the claim.  OneBeacon was well aware |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| often under 5%, and at various times under 1%, of CGL's claimed replacement cost. [Decl. of Robert Krier, ¶ 18(iii)  For examples, see Ex. 136B, pp. 29 & 34; Ex. 136D, p. 2; Ex. 136E, p. 11; Ex. 136F, p. 6; Ex. 136H, p. 73; Ex. 136I, pp. 62 & 70-73; Ex. 136J, p. 18; Ex. 136K, p. 48; and Ex. 136M, p. 3.] | that this is because of the manner in which CGL purchases, making opportunistic purchases at steep discounts on closeouts, customs' cargo, entire warehouse purchases, and other special circumstances.  CGL's agent, The Greenspan Company, was completely transparent about its original cost of goods and its basis for estimating replacement costs at many times higher. The Greenspan Company, the largest public adjuster in the country, researched the replacement cost pricing and provided full back-up for its determinations.  There is nothing misleading or improper about  CGL's estimates, other than a disagreement over value and methodology, which is what adjusting claims is all about. [William Rake Declaration ¶¶ 6-13.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| 100. **Backdated Certificates of Transfer of Title:** 32 of the Certificates of Transfer of Title submitted by CGL listed "Charley's Wholesale, Inc." as the transferring party but were dated before Charley's Wholesale, Inc. was incorporated (March 6, 2012).  3 of the Certificates of Transfer of Title were dated before CGL, Inc. was incorporated (May 24, 2010).<br><br>[Decl. of Robert Krier, ¶ 18(iv). For examples, see Ex. 136B, pp. 27 & 32; Ex. 136D, p. 6; Ex. 136E, p. 9; Ex. 136F, p. 29; Ex. 136H., p. 77: Ex. 136I, pp. 93, 95, 99, 101, 103, 105, 107, 109 & 111; Ex. 136J, p. 23; Ex. 136K, p. 66; Ex. 136L, pp. 12, 20, 28, 40, 50, 60, 69, 81, 91, 100, 110, 120, 122 & 124; and Ex. 136M, p. 7 [certificates dated before Charley's Wholesale, Inc. was formed]; and Ex. 136E, p. 9; Ex. 136H, p. 77; and Ex. 136I, p. 93 [certificates dated before | Disputed.  The Certificates of Transfer were all done on behalf of Charley's Wholesale, LLC.  The form accidentally had "Inc" instead of "LLC" and no one noticed it at the time.  Later, an entity named Charley's Wholesale, Inc., was formed, but it never did any business and was never the owner of any of this property.<br><br>[Charles Garavitt Declaration ¶¶11-19.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| CGL, Inc. was formed].]<br><br>        *See* Fact #2 for dates of incorporation of CGL, Inc. and Charley's Wholesale, Inc.] | |
| 101.  **Non-Existent Inventory Records:** Initially, Mr. Garavitt claimed that CGL had detailed inventory records for all its inventory.  Ultimately, however, CGL failed to produce inventory records for most of the items claimed.<br><br>        [Decl. of Robert Krier, ¶ 18(iv); Decl. of Alan Jones, ¶ 3.<br><br>For Mr. Garavitt's initial testimony, see Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 88:13-89:1, 112:24-119:24. | Undisputed that Mr. Garavitt claimed CGL had detailed inventory records.  Disputed that CGL failed to produce inventory records for most of the items claimed.  CGL produced thousands of documents confirming purchase and transportation of the items claimed, including paper printouts of the data from the lost computer.  Each item had bills of lading, invoices for purchase, certificates of transfer, and other supporting documents as appropriate.  The "inventory records" OneBeacon refers to are electronic records which were lost when an old Gateway laptop computer failed.  However, they are redundant to the thousands of records |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | that were produced.<br><br>[Charles Garavitt Dec.57; William Rake Declaration ¶12.  Van Heel Declaration ¶7] |
| 102.  **Medical supplies:**  As to CGL's claim for 99,463 units of medical supplies valued at over $1.9 million, OneBeacon's investigation showed: | Disputed as follows: |
| (a) The supporting purchase invoices that simply said "medical supplies" and that totaled only $7,000. | (a) First, CGL also provided a detailed list setting out all of the supplies in itemized fashion. Second, OneBeacon did not investigate to determine the cost of medical supplies.  The cost was clearly set out as part of the claim.  This is a replacement cost policy.  The costs of goods is often a fraction of its replacement cost value because of the manner in which CGL purchases, making opportunistic purchases at steep discounts on closeouts, customs' cargo, |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | entire warehouse purchases, and other special circumstances.  CGL's agent, The Greenspan Company, was completely transparent about its original cost of goods and its basis for estimating replacement costs at many times higher.  The Greenspan Company, the largest public adjuster in the country, researched the replacement cost pricing and provided full back-up for its determinations.  There is nothing misleading or improper about  CGL's estimates, other than a disagreement over value and methodology, which is what adjusting claims is all about.  [William Rake Declaration ¶¶ 6-12; Exhibit 136B, pages 2-3, Exhibit 136L pages 1-2, 5-9.] |
| (b) The Certificates of Transfer of Title showing the alleged transfer of the items from Charley's Wholesale, Inc. to CGL were dated July 6, 2010 and | This is the same as Fact #100 and disputed on the same basis.  *[See* Opposition to Fact #100.] |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied
Covenant of Good Faith and Fair Dealing is Barred Because There Was a
Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| September 15, 2010 – over two and a half years before Charley's Wholesale, Inc. was incorporated.<br><br>    [Decl. of Robert Krier, ¶ 18(iv) (generally).  See also:<br><br>    (a) Ex. 136B, pp. 29 & 34 (alleged purchase invoices).<br><br>    (b) Ex. 136B, pp. 27 & 32 (certificates of transfer of title).] | |
| 103.  **Jewelry**:  As to CGL's claim for 98,000 units of jewelry valued at over $700,000, OneBeacon's investigation showed: | Disputed as follows: |
|     (a) The supporting purchase invoice simply said "jewelry" for a price of only $4,800. | Disputed.  The cited evidence does not support the fact. |
|     (b) The shipping records purporting to show the shipment of the jewelry to Palmdale listed only 50,000 units. | (b) These were 3 piece sets that were broken into one piece rings and two piece sets, for 98,000 pieces instead of 50,000, all of which was disclosed to OneBeacon. |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| **Uncontroverted Fact** | **Opposing** |
|---|---|
| | [William Rake Declaration ¶ 16.] |
| (c) None of the pre-loss photos of merchandise in Palmdale showed the jewelry. | (*See*)The cited evidence does not support the fact. The photos did not show many parts of the warehouse. |
| (d) The warehouse map didn't list jewelry in the warehouse area, and the jewelry shown in the retail area was different "cheap" jewelry according to Mr. Garavitt. | The warehouse map was not accurate and the witness who drew it was not an employee of CGL and was biased against CGL. (He demanded money just before giving testimony and has filed multiple legal actions against CGL for workers compensation and labor claims.) |
| | [Charles Garavitt Declaration ¶¶ 31; 37-40.  Jose Rojas Depo, Exhibit 375, 109:20-110:14.] |
| (e) No pre-fire computer inventory records were given to OneBeacon listing the jewelry. | OneBeacon is well aware that the computerized records were lost when the computer failed.  No computerized records were provided for most items because the files were lost. |
| | [Van Heel Declaration ¶7-9.] |
| (f) The Certificate of Transfer of | Disputed.  This is the same as Fact #100 |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| Title was dated before Charley's Wholesale, Inc. existed.<br><br>    [Decl. of Robert Krier, ¶ 18(vii) (generally). See also:<br><br>    (a) Ex. 136D, p. 2 (alleged purchase invoice).<br><br>    (b) Ex. 136D, pp. 9-10 (alleged shipping records).<br><br>    (c) Ex. 7 (pre-loss photos)<br><br>    (d) Ex. 9 (Sosa's warehouse map); Decl. of Robert Krier, ¶ 18(vii)<br><br>    (e) Decl. of Robert Krier, ¶ 18(vii).<br><br>    (f) Ex. 136D, p. 6 (alleged certificate of transfer of title) | above.<br><br>    [*See* Evidence cited in dispute of Fact #100 above.] |
| 104.  **Poster Board/Tag Board and Art Paper:**  As to CGL's claim for 1,000,000 sheets of tag board and 1 million sheets of art paper, OneBeacon's investigation showed: | Disputed as follows: |

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| (a) Multiple versions of the supporting invoice (GBUS invoice # 1376) existed: one which listed 2 million sheets of poster board/tag board and 2 million sheets of art paper; one which listed only 1 million sheets of each; and one that was actually signed and that did not list *any* poster board/tag board or *any* art paper. | (a) This is the same as Fact #99 and disputed on the same basis. At the request of OneBeacon, CGL went back to vendors and requested that they provided more detailed versions of the invoices already provided.<br><br>[*See* Evidence cited in opposition to Fact #99.] |
| (b) The shipping documents in CGL's claim submission showed only 130,000 units of tag board being sent to Palmdale. | Greenspan reviewed and provided shipping invoices for all of the inventory claimed.<br><br>[William Rake Declaration ¶ 12.] The shipping invoices used the term "Tag Board" and not "art paper". |
| (c) CGL's claim submission included no shipping documents that listed any art paper being sent to Palmdale. | [William Rake Declaration ¶12; Exhibit 136(b) p. 2.] OneBeacon is well aware that the computerized records were lost when |
| (d) CGL submitted no pre-fire computer inventories listing the art paper or tag board. | the computer failed.  No computerized records were provided for most items because the files were lost. |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| | [Van Heel Declaration ¶7-9.] |
| (e) Nothing resembling the claimed large quantity poster board/tag board showed up in any of the pre-loss photos. | The photos do not show the entire contents of the warehouse and it is imposible to determine from the photos what is inside some of the boxes. |
| | [Charles Garavitt Declaration ¶ 36.] |
| (f) The warehouse map did not reflect the large claimed amount of poster board/tag board. | The warehouse map was not an official map of the warehouse.  The map was not accurate and the witness was biased against CGL. (He demanded money just before giving testimony and has filed multiple legal actions against CGL for workers compensation and labor claims.)  Inventory was crammed into the warehouse so much so that you could not walk through the warehouse, contrary to the way the warehouse is depicted on the map. |
| | [Charles Garavitt Declaration ¶31, 37-40; Jose Rojas Depo, Exhibit |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | 375, 109:20- 110:14.] |
| (g) The Certificate of Transfer of Title was dated before *either* CGL *or* Charley's Wholesale, Inc. existed. | This is the same as Fact #100 above and disputed on the same basis. |
| [Decl. of Robert Krier, ¶ 18(viii) (generally).  See also: | [*See* Evidence cited in dispute of Fact #100 above.] |

(a) *Compare* Ex. 136E, p. 11 (version submitted in CGL's claim notebook, listing 1 million sheets of each);

*With*

Ex. 252, p. 46 (version listing 2 million sheets of each) and Ex. 252, p. 44 (signed version not listing any poster board/tag board or any art paper).

(b) Ex. 136E, pp. 6-7.

(c) Ex. 136E.

(d)  Decl. of Robert Krier, ¶ 18(viii).

(e)  Ex. 7 (pre-loss photos)

(f) Ex. 9 (Mr. Sosa's warehouse

**106**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| **Uncontroverted Fact** | **Opposing** |
|---|---|
| map) | |
| (g) Ex. 136E, p. 9. | |
| | |
| 105.  **Hair Products:**  As to CGL's claim for hair products valued at over $7 million, OneBeacon's investigation showed: | Disputed as follows: |
| (a) CGL submitted a purported purchase invoice dated January 19, 2012 on which Mr. Garavitt had handwritten "Paid 1/20/2012." | (a) is undisputed. |
| (b) On examination, however, Mr. Garavitt admitted that he obtained that invoice from the vendor *after* the fire and had it backdated to January 2012. | (b) The testimony cited by OneBeacon makes it perfectly clear that the invoices were obtained at the request of OneBeacon who asked for invoices. When CGL did not have an invoice, it called the vendor and asked the vendor to reissue the invoice or provide a detailed invoice. There is nothing improper about this nor any attempt to hide any information.  OneBeacon has not pointed to an inaccuracy in this |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
| --- | --- |
| | invoice. |
| | [Charles Garavitt 3/19/2014 Examination Under Oath, Ex. 308 at 604:15-607:9.] |
|     (c) The Certificate of Transfer of Title was dated before Charley's Wholesale, Inc. existed. <br>     [Decl. of Robert Krier, ¶ 18(ix) (generally).  See also: <br>     (a) Ex. 136F, p. 6. <br>     (b) Charles Garavitt 3/19/2014 Examination Under Oath, Ex. 308 at 604:15-607:9; and Ex. 136F, p. 6. <br>     (c) Ex. 136F, p. 29. | (c) This is the same as Fact #100 above and disputed on the same basis. <br>     [*See* Evidence cited in dispute of Fact #100 above.] |
| 106.  **Fabric:**  As to CGL's claim for over 1 million yards of unfinished fabric and over 650,000 yards of finished fabric, OneBeacon's investigation showed: | Disputed as follows: |
|     (a)  OneBeacon's salvage and | The third party seller sold it to CGL as |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| fabric experts only found evidence of (less valuable) unfinished fabric and no rolls of finished fabric. | finished fabric and CGL paid finished fabric prices for it.  If it is in fact not finished fabric, CGL had no knowledge of that fact.<br><br>[Charles Garavitt Declaration ¶ 49.] |
| (b) The shipping documentation provided by CGL in its claim submission (even assuming it was legitimate) showed hundreds of thousands of yards less of finished fabric begin sent to Palmdale than in claimed as lost.<br><br>Decl. of Robert Krier, ¶ 18(x) (generally).  See also:<br><br>(a) Ex. 300 [portions of Greer & Kirby's Palmdale salvage inspection report for fabric] and Ex. 301 [forensic accountant's fabric report].<br><br>(b) *Compare* Ex. 136G, pp. 97-104 [bills of lading and packing slips submitted by CGL for finished fabric, | CGL also provided an itemized list of all fabric in the warehouse, together with purchase contracts showing the amount it purchased and the purchase price.  CGL's documentation was far from perfect, but they did the best they could to document everything.  All of the fabric was taken to Palmdale, so there is no other location for it.  If the documentation is not completely consistent, that does not mean the fabric was not present. It could equally mean the documentation is faulty.<br><br>[William Rake Declaration ¶10; Charles Garavitt Declaration ¶49.] (Discussing that if some of the fabric |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| totaling only 105,659 yards; note pages 99-100 is a duplicate of 101-102]; | identified as finished was actually unfinished, CGL had no knowledge of that fact and was sold the fabric as finished.) |
| *With* Ex. 136G, pp. 2-67 [spreadsheet submitted by CGL of fabric claimed to have been lost; line items 1-2151 correspond to finished fabric and total over 650,000 yards]; Ex. 301[expert report calculating the total yards of finished fabric claimed by CGL to be over 650,000 yards]. | |
| 107.   **Cell Phone Accessories:**  As to CGL's claim for 299,000 cell phone accessories valued at over $1.4 million, OneBeacon's investigation showed: | Disputed as follows: |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| (a)  CGL's cell phone accessories claim included $658,840 for 10,136 "LG Chocolate Music Phone Packages" that CGL initially represented to be actual LG Chocolate cell phones valued at $65 each. | (a) Greenspan initially misidentified the product as actual cell phones, but caught the error and promptly corrected it. Greenspan is the leading public adjuster in the country, the claim was handled by its president, and it certainly was not involved in any intentional deception.<br><br>[William Rake Declaration ¶ 11.] |
| (b) After investigating, OneBeacon discovered that the claimed "Music Phone Packages" that constituted the largest portion of the claim did not actually include a phone, but rather only accessories of much lower value. | (b) Greenspan caught the error on its own and corrected it on its own.  The truth did not arise as the result of OneBeacon's investigation, but rather because an error by a third party was caught and corrected.<br><br>[William Rake Declaration ¶ 11.] |
| (c) OneBeacon discovered over 6,000 of the claimed 299,000 units of cell phone accessories in CGL's Cerritos warehouse. | (c) This is a minor discrepancy and one which should have and ordinarily would have been reconciled in discussions unless OneBeacon had prejudged and already decided to deny the claim.<br>[William Rake Declaration ¶¶ 3-5.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| (d) The Certificate of Transfer of Title was dated before *either* CGL *or* Charley's Wholesale, Inc. existed. | (d) This is the same as Fact #100 and is disputed on the same basis. |
| [Decl. of Robert Krier, ¶ 18(xi) (generally).  See also: | [See Evidence opposing Fact #100.] |

(a) Ex. 136H, p. 2 at line 24 [spreadsheet itemizing claimed accessories] & p. 19 [example of the claimed $65 phone submitted by CGL].

(b) Decl. of Robert Krier, ¶ 18(xi).

(c) Decl. of Robert Krier, ¶ 18(xi); Ex. 297 [excerpts of Cerritos inventory performed by Greer & Kirby]

(d) Ex. 136H, p. 77 [alleged certificate of transfer of title].]

| | |
|---|---|
| 108.  **Clothing**:  As to CGL's claim for over 300,000 pieces of clothing (including designer brands) valued at over $10 million, OneBeacon's investigation showed: | Disputed as follows: |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| (a) CGL submitted no pre-fire computerized listing any of the clothes except 2,000 Isaac Mizrahi dresses. | (a) OneBeacon is well aware that the computerized records were lost when the computer failed.  No computerized records were provided for most items because the files were lost. |
| | [Van Heel Declaration ¶7-9.] |
| (b) All but one of the Certificates of Transfer of Title were dated before Charlie's Wholesale, Inc. existed, and one was dated before either Charley's Wholesale, Inc. or CGL, Inc. existed. | (b) This is the same as Fact 100 and is disputed on the same basis |
| [Decl. of Robert Krier, ¶ 18(xii) (generally). See also: | [*See* Evidence cited in opposition to Fact #100.] |

[Decl. of Robert Krier, ¶ 18(xii) (generally). See also:

(a) Decl. of Robert Krier, ¶ 18(xii):

(b) Ex. 136I, pp. 95, 99, 101, 103, 105, 107, 109 & 111 [certificates that pre-date Charley's Wholesale, Inc.] and p. 93 [certificate that pre-dates both Charley's Wholesale, Inc. and CGL].]

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| 109.  **Mat Boards:** As to CGL's claim for 2,000,000 mat boards and 1.4 million posters,  OneBeacon's investigation showed: | Disputed as follows: |
| (a) CGL's shipping documentation purported to show the 2,000,000 mat boards and 1.4 million posters being shipped to Palmdale in a single trailer.  According to OneBeacon's consultant, it in fact would have taken over 50 trailers to transport that much product.  CGL even admitted that all 2,000,000 mat boards and 1.4 million posters could not have fit into one trailer. | (a) CGL has produced documents showing 22 truck loads of mat boards and posters being delivered to Palmdale.<br><br>[Leo Vasquez Declaration, all paragraphs.] |
| (b) CGL submitted no pre-fire computerized inventory records showing the mat boards or posters. | OneBeacon is well aware that the computerized records were lost when the computer failed.  No computerized records were provided for most items because the files were lost.<br><br>[Van Heel Declaration ¶7-9.] |
| (c) The warehouse map did not | The warehouse map was not an official |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| reflect the large claimed volume of mat boards and posters. | map of the warehouse.  The map was not accurate and the witness was biased against CGL. (He demanded money just before giving testimony and has filed multiple legal actions against CGL for workers compensation and labor claims.)  Inventory was crammed into the warehouse so much so that you could not walk through the warehouse, contrary to the way the warehouse is depicted on the map.<br><br>[Charles Garavitt Declaration ¶31, 37-40; Jose Rojas Depo, Exhibit 375, 109:20- 110:14.] |
| (d) The pre-fire photographs did not reflect the large claimed volume of mat boards and posters. | The photos do not show the entire contents of the warehouse and it is imposible to determine from the photos what is inside some of the boxes.<br><br>[Charles Garavitt Declaration ¶ 36.] |
| (e) OneBeacon found some of the product – over hundreds of thousands of | OneBeacon did not find them.  Mr. Van Heel of CGL found them and reported |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1: CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| posters and poster prints – in Cerritos after the fire. | them to CGL, who reported them to The Greenspan Company. These posters and prints were not included in the final proof of claim. |
| | [Van Heel Dec 11; Charles Garavitt Dec. ¶65.] |
| (f) After Greer & Kirby conducted its Cerritos inventory, CGL reduced its posters claim to 1,173,975 posters. | Undisputed, except disputed to the extent the fact is intended to imply that CGL reduced its claim because of any wrongdoing on its part. |
| | [Van Heel Dec 11; Charles Garavitt Dec. ¶65.] |
| (g) The Certificate of Transfer of Title was dated before Charley's Wholesale, Inc. existed. | This is the same as Fact #100 and is disputed on the same basis. |
| [Decl. of Robert Krier, ¶ 18(xiii) (generally). See also: | |
| (a) Ex. 136J, pp. 15-16; Decl. of Robert Krier, ¶ 18(xiii); Decl. of Alan Jones, ¶ 10; Ron Van Heel 11/25/2013 Examination Under Oath, Ex. 305 at 550:14-20 and 554:10-555:9 (admission | |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| that it would have taken more than one trailer to transport all of the claimed mat boards and posters). | |
| (b) Decl. of Robert Krier, ¶ 18(xiii). | |
| (c) Ex. 9 (warehouse map). | |
| (d) Ex. 7 (pre-fire photos) | |
| (e) Ex. 297 [Greer & Kirby Cerritos inventory report] | |
| (f) Compare Ex. 287 at p. 16166 [May 2013 poster submission claiming 1.4 million poster] with Ex. 136J, p. 2 [final poster submission]. | |
| (g) Ex. 136J, p. 23. | |
| | |
| 110.  **Wood Molding:** As to CGL's claim for over 2,000,000 linear feet of wood molding valued at over $9 million, OneBeacon's investigation showed: | Disputed as follows: |
| (a) Greer & Kirby's post-fire inventory of wood molding stored | Disputed.  The post-fire inventory lacks foundation.  Photos and video of the |

**117**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| outside the Palmdale building (which was water and smoke damaged but which did not burn) found less than 1 million feet. | wood after the fire demonstrate that it cannot possibly be counted.  The images are reminiscent of a holocaust, with wood splintered and crushed into enormous mounds that could never be accurately inventoried. CGL provides direct testimony of the amount of wood (2 million linear feet).  OneBeacon's post-fire calculation is just some evidence that creates in an issue of fact.<br><br>[Charles Garavitt Dec. ¶63, Ex. 376, 377.] |
| (b) To account for the missing 1 million feet of molding, CGL represented that two Mexican laborers had used 1 million feet of the molding to make 100,000 picture frames which were stored on pallets inside the Palmdale warehouse at the time of the fire, and which burned completely away in the fire. | This is the same as Fact #62 and is disputed on the same basis.<br><br>[*See* Evidence Opposing Fact # 62, above.] |
| (c) The warehouse map did not | The warehouse map was not an official |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| reflect the existence of 100,000 palletized picture frames. | map of the warehouse.  The map was not accurate and the witness was biased against CGL. (He demanded money just before giving testimony and has filed multiple legal actions against CGL for workers compensation and labor claims.)  Inventory was crammed into the warehouse so much so that you could not walk through the warehouse, contrary to the way the warehouse is depicted on the map.  The map could not accurately reflect what was stored in the warehouse.<br><br>[Charles Garavitt Declaration ¶31, 37-40; Jose Rojas Depo, Exhibit 375, 109:20- 110:14.] |
| (d) The pre-fire photographs did not show any palletized picture frames. | Most of the frames were stored outside, cut but unassembled.  There were only 4 or 5 pallets of assembled frames. The photos do not show the entire contents of the warehouse.<br><br>[Charles Garavitt Declaration ¶ |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| <u>Uncontroverted Fact</u> | <u>Opposing</u> |
|---|---|
| | 36, 38.] |
| (e) Mr. Garavitt initially represented that CGL had detailed inventory records reflecting the molding and the frames made from the molding, but CGL never produced such records. | Undisputed that Mr. Garavitt initially claimed CGL had detailed inventory records.  Disputed that CGL failed to produce inventory records for most of the items claimed.  CGL produced thousands of documents confirming purchase and transportation of the items claimed.  Each item had bills of lading, invoices for purchase, certificates of transfer, and other supporting documents as appropriate.  The "inventory records" OneBeacon refers to are electronic records which were lost when an old Gateway laptop computer failed.  Further, after giving that testimony, Mr. Garavitt learned that the inventory system he thought was in place was not actually in place, that it was a work in progress and that much of the inventory was never placed on the |

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| | computer.  However, they are redundant to the thousands of records that were produced. |
| | [Charles Garavitt Dec.57; William Rake Declaration ¶12.  Van Heel Declaration ¶11] |
| (f) CGL did not present documentation, such as a contract or cancelled checks, corroborating the alleged Mexican laborer arrangement. | Undisputed. |
| (g) It appeared implausible that two laborers could make 100,000 frames in the time available (for example, if the laborers made one frame every 5 minutes (96 in an 8 hour day), it would take over 1,000 work days to make 100,000 frames). | Disputed.  The laborers only cut the material.  They did not assemble it. [Charles Garavitt Declaration ¶38.] |
| (h) The Certificate of Transfer of Title was dated before Charley's Wholesale, Inc. existed. [Decl. of Robert Krier, ¶ 18(xiv) | This is the same as Fact #100 and is disputed on the same basis. [*See* Evidence Opposing Fact # 100.] |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

<u>Uncontroverted Fact</u>                                    <u>Opposing</u>

(generally).  See also:

(a) Ex. 298 [portions of Greer & Kirby's Palmdale salvage inspection report for wood molding]; Ex. 299 [forensic accountant's report concerning wood molding].

(b)  *See* evidence detailed in Fact 62, above.

(c) Ex. 9 (warehouse map)

(d) Ex. 7 (pre-fire photos)

(e) Charles Garavitt 12/7/2012 Examination Under Oath, Ex. 302 at 112:24-119:24 [general description of monthly inventory system]; 189:16-24 [representation that same inventory tracking system applies to the posters and mat boards]; 203:21-204:3 [description of the inventory system using art paper as an example]; 167:2-4 [representation that Ramin wood was added to the computer inventory when received]; Decl. of Robert Krier, ¶

**122**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| 18(xiv). | |
| (f)  Decl. of Robert Krier, ¶ 18(xiv) | |
| (g)  Decl. of Robert Krier, ¶ 18(xiv) | |
| (h) Ex. 136K, p. 66. | |
| | |
| 111.   **Vitamins**:  As to CGL's claim for 12,000 bottles of vitamins valued at $42,000, OneBeacon's investigation showed: | Disputed as follows: |
| (a) CGL's shipping records showed only 5,600 bottles being sent to Palmdale. | (a) and (b) Greenspan calculated the amount and value of the vitamins.  The invoice shows 12,000 bottles.  The "shipping record" is just a packing slip, not a complete record of shipping. |
| (b) The purported shipping record was dated December 20, 2011 – four months before CGL allegedly acquired the vitamins. | [Ex. 136L, pgs. 9-10.] |
| (c) The Certificate of Transfer of Title was dated before Charley's | |

**123**

**Partial Summary Judgment Issue 1:  CGL's Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing is Barred Because There Was a Genuine Dispute Over CGL's Right to Payment**

| Uncontroverted Fact | Opposing |
|---|---|
| Wholesale, Inc. existed.<br><br>[Decl. of Robert Krier, ¶ 18(xv) (generally).  See also:<br><br>(a) Ex. 136L, p. 10.<br><br>(b) *Compare* Ex. 136L, p. 10 [alleged packing slip to Palmdale dated December 2011]<br><br>*With*<br><br>Ex. 136L, p. 9 [alleged purchase and inbound shipment record dated April 2012].<br><br>(c) Ex. 136L, p. 12. | |
| 112.  **Financial Motive**:  During the course of investigating the claim, OneBeacon learned the facts set forth in separate statement paragraphs 11 through 16 concerning the financial condition of CGL and Mr. Garavitt.<br><br>[Decl. of Robert Krier, ¶ 17.] | Disputed on the same basis as Fact #s 11 through 16 are disputed.<br><br>[*See*  Evidence cited Opposing Facts # 11 through 16.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

1
2
3

**Partial Summary Judgment Issue 2:  CGL's Claim for Punitive Damages Is Barred Because OneBeacon Did Not Act Maliciously, Fraudulently, or Oppressively**

| Uncontroverted Fact | Supporting Evidence |
| --- | --- |
| 113.   OneBeacon incorporates the facts in paragraphs 80-112 above.<br><br>[OneBeacon incorporates the facts in paragraphs 80-112 above.] | Disputed to the extent disputed in the Oppositions to paragraphs 80 – 112 above.<br><br>[CGL incorporates the Opposition Facts in paragraphs 80 – 112 above.] |

**PLAINTIFF'S ADDITIONAL FACTS**

| Uncontroverted Fact | Supporting Evidence |
| --- | --- |
| 114.   OneBeacon's consultants provided reports which valued the claim presented by CGL in excess of $30 million. | Alterman Appraisals/Linderwall Appraisal valuing all goods except fabric and wood at $27,658,998. (Exhibit 384 produced by OneBeacon); Matson Driscoll Report valuing wood claim at $291,179 and Matson Driscoll Report valuing fabric claim at $2,109,863 (Exhibits 247, 248.) |
| 115.   When OneBeacon issued the insurance, it underwrote the policy and determined that CGL had a $60 million insurable interest before it sold the | [Boyd Taylor Depo, Exhibit 387, pg. 7:24-8:12, 39:17-20, 40:2-16, 41:23-44:9, 47:2-14.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**PLAINTIFF'S ADDITIONAL FACTS**

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| policy. | |
| 116.   OneBeacon created a physical inspection report of one of CGL's warehouses as part of its underwriting, the underwriting PMK testified concerning the content of the report but OneBeacon refuses to produce the report claiming it does not exist.  That report would show that CGL had $60 million in inventory. | [Boyd Taylor Depo, Exhibit 387, pgs. 41:23-44:9, 42:21-43:5, 56:19-57:11, 57:20] (Boyd's extensive testimony admitting the existence of the report which was based upon a physical inspection of the warehouse); Charles Garavitt Dec. ¶41-42. |
| 117.   The Greenspan Company performed the analysis and made the replacement cost price determination for all lost items except the wood. | [Rake Dec. ¶7-10.] |
| 118.   OneBeacon's claim handling was atypical in that OneBeacon refused to participate in discussions ordinarily had during claims processing to avoid just the kinds of issues that OneBeacon raises here.  This conduct suggested to | [Rake Dec. ¶¶3-5.] |

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**

**PLAINTIFF'S ADDITIONAL FACTS**

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| CGL's veteran public adjuster that one OneBeacon had decided from the beginning to deny the claim. | |
| 119.   CGL's claims submission by the Greenspan Company included backup documentation showing how it came to the pricing conclusions, the source of the pricing information, and the basis for its conclusions.  The entire process was transparent. | [Rake Dec, ¶12] |
| 120.   Once litigation started, OneBeacon retained a new expert (Jacqueline Snyder) to value the claim at an even lower value than its first expert.  Snider valued the claim at approximately $6.3 million, not including fabric and medical devices. | [Exhibit 385 (expert report of Jacqueline Snyder).] |
| 121.   It was impossible to accurately and reliably count the linear footage of the wood after the fire.  The wood was | [Exhibit 377 (after fire photos of the wood); 378 (after fire video of the wood); [Charles Garavitt Dec. ¶63.] |

PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT

**PLAINTIFF'S ADDITIONAL FACTS**

| <u>Uncontroverted Fact</u> | <u>Supporting Evidence</u> |
|---|---|
| bulldozed, broken to pieces, soaked and piled into enormous mounds. | |
| 122.  The Palmdale warehouse was so full before the fire that it was hard to walk around. | [Rojas Depo., Exhibit 375, 109:20-110:14; Charles Garavitt Dec. ¶¶33-38.] |

Dated:  August 21, 2015               Respectfully submitted,

                                     LAW OFFICE OF SASSOON SALES

                                     By:          /S/
                                              SASSOON SALES, ESQ.
                                              Attorneys for Plaintiffs

**PLTF STATEMENT OF GENUINE ISSUES IN OPPOSITION TO MTN FOR SUMMARY JUDGMENT**